## KRAMER *v.* UNION FREE SCHOOL DISTRICT NO. 15 ET AL.

No. 258.   Argued January 16, 1969.—
Decided   June 16, 1969.

*Osmond K. Fraenkel* argued the cause for appellant. With him on the brief were *Melvin L. Wulf* and *Murray A. Miller.*

*John P. Jehu* argued the cause and filed briefs for appellees.   *Louis J. Lefkowitz,* Attorney General, *pro se,*

*Samuel A. Hirshowitz,* First Assistant Attorney General, and *Daniel M. Cohen,* Assistant Attorney General, filed a brief for appellee the Attorney General of New York.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

In this case we are called on to determine whether § 2012 of the New York Education Law is constitutional. The legislation provides that in certain New York school districts residents who are otherwise eligible to vote in state and federal elections may vote in the school district election only if they (1) own (or lease) taxable real property within the district, or (2) are parents (or have custody of) children enrolled in the local public schools. Appellant, a bachelor who neither owns nor leases taxable real property, filed suit in federal court claiming that § 2012 denied him equal protection of the laws in violation of the Fourteenth Amendment. With one judge dissenting, a three-judge District Court dismissed appellant's complaint. Finding that § 2012 does violate the Equal Protection Clause of the Fourteenth Amendment, we reverse.

I.

New York law provides basically three methods of school board selection. In some large city districts, the school board is appointed by the mayor or city council. N. Y. Educ. Law § 2553, subds. 2, 4 (1953), as amended (Supp. 1968). On the other hand, in some cities, primarily those with less than 125,000 residents, the school board is elected at general or municipal elections in which all qualified city voters may participate. N. Y. Educ. Law §§ 2502, subd. 2, 2553, subd. 3 (1953). Cf. N. Y. Educ. Law § 2531 (1953). Finally, in other districts such as the one involved in this case, which are primarily rural

and suburban, the school board is elected at an annual meeting of qualified school district voters.[1]

The challenged statute is applicable only in the districts which hold annual meetings. To be eligible to vote at an annual district meeting, an otherwise qualified[2] district resident must either (1) be the owner or lessee of taxable real property located in the district, (2) be the spouse of one who owns or leases qualifying property, or (3) be the parent or guardian of a child enrolled for a specified time during the preceding year in a local district school.

Although the New York State Department of Education has substantial responsibility for education in the State, the local school districts maintain significant control over the administration of local school district affairs.[3] Generally, the board of education has the basic responsibility for local school operation, including prescribing the courses of study, determining the textbooks

---

[1] In some districts the election takes place on the Wednesday following the district meeting. N. Y. Educ. Law § 2013 (Supp. 1968).

[2] The statute also requires that a voter be a citizen of the United States and at least 21 years of age. Appellant meets these requirements and does not challenge the citizenship, age, or residency requirements of § 2012. See *infra,* at 625. The statute is set out in the Appendix, *infra.*

[3] "But while the administration of schools and the formulation of general policies have been centralized in the State Education Department . . . the immediate control and operation of the schools in New York have to a large extent been vested in the localities. The thousands of districts . . . possess a high degree of authority in education. They decide matters of local taxation for school purposes, elect trustees and other school officials, purchase buildings and sites, employ teachers and . . . maintain discipline . . . ." Graves, Development of the Education Law in New York, 16 Consolidated Laws of New York (Education Law) xxiii (McKinney 1953). See R. Pyle, Some Aspects of Education in New York 9–13 (1967).

to be used, and even altering and equipping a former schoolhouse for use as a public library. N. Y. Educ. Law § 1709 (1953). Additionally, in districts selecting members of the board of education at annual meetings, the local voters also pass directly on other district matters. For example, they must approve the school budget submitted by the school board. N. Y. Educ. Law §§ 2021, 2022 (1953).[4] Moreover, once the budget is approved, the governing body of the villages within the school district must raise the money which has been declared "necessary for teachers' salaries and the ordinary contingent expenses [of the schools]." N. Y. Educ. Law § 1717 (1953).[5] The voters also may "authorize such acts and vote such taxes as they shall deem expedient . . . for . . . equipping for library use any former schoolhouse . . . [and] for the purchase of land and buildings for agricultural, athletic, playground or social center purposes . . . ." N. Y. Educ. Law § 416 (1953).

Appellant is a 31-year-old college-educated stockbroker who lives in his parents' home in the Union Free School District No. 15, a district to which § 2012 applies. He is a citizen of the United States and has voted in federal and state elections since 1959. However, since

[4] In districts which do not have annual meetings, the budget is not submitted to district voters. Thus, in city districts where the board of education is elected by all the voters, the board has the power to set the budget and assess taxes to meet expenditures. In large city districts, where the board is appointed, the board must submit requests to the city government, much as would any other city department. R. Pyle, Some Aspects of Education in New York 11 (1967).

[5] The legislation provides that the money shall be raised through a "tax, to be levied upon all the real property in [the] village . . . ." And, the "corporate authorities shall have no power to withhold the sums so declared to be necessary . . . ." N. Y. Educ. Law § 1717 (1953).

he has no children and neither owns nor leases taxable real property, appellant's attempts to register for and vote in the local school district elections have been unsuccessful. After the school district rejected his 1965 application, appellant instituted the present class action challenging the constitutionality of the voter eligibility requirements.

The United States District Court for the Eastern District of New York denied appellant's request (made pursuant to 28 U. S. C. § 2281) that a three-judge district court be convened, and granted appellees' motion to dismiss appellant's complaint. *Kramer* v. *Union Free School District No. 15,* 259 F. Supp. 164 (D. C. E. D. N. Y. 1966). On appeal, the Court of Appeals for the Second Circuit reversed, ruling appellant's complaint warranted convening a three-judge court. *Kramer* v. *Union Free School District No. 15,* 379 F. 2d 491 (C. A. 2d Cir. 1967). On remand, the three-judge court ruled that § 2012 is constitutional and dismissed appellant's complaint. 282 F. Supp. 70. Pursuant to 28 U. S. C. § 1253, appellant filed a direct appeal with this Court; we noted probable jurisdiction. 393 U. S. 818 (1968).

## II.

At the outset, it is important to note what is *not* at issue in this case. The requirements of § 2012 that school district voters must (1) be citizens of the United States, (2) be bona fide residents of the school district, and (3) be at least 21 years of age are not challenged. Appellant agrees that the States have the power to impose reasonable citizenship, age, and residency requirements on the availability of the ballot. Cf. *Carrington* v. *Rash,* 380 U. S. 89, 91 (1965); *Pope* v. *Williams,* 193 U. S. 621 (1904). The sole issue in this case is whether the *additional* requirements of § 2012—requirements which prohibit some district residents who are otherwise

qualified by age and citizenship from participating in district meetings and school board elections—violate the Fourteenth Amendment's command that no State shall deny persons equal protection of the laws.

"In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968). And, in this case, we must give the statute a close and exacting examination. "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964). See *Williams* v. *Rhodes, supra,* at 31; *Wesberry* v. *Sanders,* 376 U. S. 1, 17 (1964). This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.

Thus, state apportionment statutes, which may *dilute* the effectiveness of some citizens' votes, receive close scrutiny from this Court. *Reynolds* v. *Sims, supra.* See *Avery* v. *Midland County,* 390 U. S. 474 (1968). No less rigid an examination is applicable to statutes *denying* the franchise to citizens who are otherwise qualified by residence and age.[6] Statutes granting the franchise to

---

[6] This case presents an issue different from the one we faced in *McDonald* v. *Board of Election Comm'rs of Chicago,* 394 U. S. 802 (1969). The present appeal involves an absolute denial of the franchise. In McDonald, on the other hand, we were reviewing a statute which made casting a ballot easier for some who were

residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives.[7] Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest. See *Carrington* v. *Rash, supra,* at 96.

And, for these reasons, the deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens may participate in the election of legislators and other public officials. Those decisions must be carefully scrutinized by the Court to determine whether each resident citizen has, as far as is possible, an equal voice in the selections. Accordingly, when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court

unable to come to the polls. As we noted, there was no evidence that the statute absolutely prohibited anyone from exercising the franchise; at issue was not a claimed right to vote but a claimed right to an absentee ballot. *Id.,* at 807–808.

[7] Of course, the effectiveness of any citizen's voice in governmental affairs can be determined only in relationship to the power of other citizens' votes. For example, if school board members are appointed by the mayor, the district residents may effect a change in the board's membership or policies through their votes for the mayor. Cf. N. Y. Educ. Law § 2553, subds. 2, 4 (1953), as amended (Supp. 1968). Each resident's formal influence is perhaps indirect, but it is equal to that of other residents. However, when the school board positions are filled by election and some otherwise qualified city electors are precluded from voting, the excluded residents, when compared to the franchised residents, no longer have an effective voice in school affairs. This is precisely the situation with regard to the size of the school budget in districts where § 2012 applies. See n. 4, *supra.*

can conceive of a "rational basis" for the distinctions made [8] are not applicable. See *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 670 (1966). The presumption of constitutionality and the approval given "rational" classifications in other types of enactments [9] are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality. And, the assumption is no less under attack because the legislature which decides who may participate at the various levels of political choice is fairly elected. Legislation which delegates decision making to bodies elected by only a portion of those eligible to vote for the legislature can cause unfair representation. Such legislation can exclude a minority of voters from any voice in the decisions just as effectively as if the decisions were made by legislators the minority had no voice in selecting.[10]

The need for exacting judicial scrutiny of statutes distributing the franchise is undiminished simply because, under a different statutory scheme, the offices subject

[8] See, *e. g., McGowan* v. *Maryland,* 366 U. S. 420, 425–428 (1961); *Allied Stores* v. *Bowers,* 358 U. S. 522, 527 (1959); *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, 556 (1947).

[9] Of course, we have long held that if the basis of classification is inherently suspect, such as race, the statute must be subjected to an exacting scrutiny, regardless of the subject matter of the legislation. See, *e. g., McLaughlin* v. *Florida,* 379 U. S. 184, 192 (1964); *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 420 (1948); *Oyama* v. *California,* 332 U. S. 633, 640 (1948).

[10] Thus, statutes structuring local government units receive no less exacting an examination merely because the state legislature is fairly elected. See *Avery* v. *Midland County,* 390 U. S. 474, 481, n. 6 (1968).

to election might have been filled through appointment.[11] States do have latitude in determining whether certain public officials shall be selected by election or chosen by appointment and whether various questions shall be submitted to the voters. In fact, we have held that where a county school board is an administrative, not legislative, body, its members need not be elected. *Sailors* v. *Kent Bd. of Education,* 387 U. S. 105, 108 (1967). However, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper* v. *Virginia Bd. of Elections, supra,* at 665.[12]

Nor is the need for close judicial examination affected because the district meetings and the school board do not have "general" legislative powers. Our exacting examination is not necessitated by the subject of the election; rather, it is required because some resident citizens are permitted to participate and some are not. For example, a city charter might well provide that the elected city council appoint a mayor who would have broad administrative powers. Assuming the council were elected consistent with the commands of the Equal Protection Clause, the delegation of power to the mayor would not call for this Court's exacting review. On the other hand, if the city charter made the office of mayor subject to an

---

[11] Similarly, no less a showing of a compelling justification for disenfranchising residents is required merely because the questions scheduled for the election need not have been submitted to the voters.

[12] In *Sailors* v. *Kent Bd. of Education,* 387 U. S. 105 (1967), each local school board sent one delegate to a biennial meeting at which the members of the county board of education were selected. We noted that "the choice of members of the county school board did not involve an election." *Id.,* at 111. However, we also pointed out that the members of the local school boards, who in effect made the county board appointments, were elected, but that "no constitutional complaint [was] raised respecting that election." *Ibid.*

election in which only some resident citizens were entitled to vote, there would be presented a situation calling for our close review.

## III.

Besides appellant and others who similarly live in their parents' homes, the statute also disenfranchises the following persons (unless they are parents or guardians of children enrolled in the district public school): senior citizens and others living with children or relatives; clergy, military personnel, and others who live on tax-exempt property; boarders and lodgers; parents who neither own nor lease qualifying property and whose children are too young to attend school; parents who neither own nor lease qualifying property and whose children attend private schools.

Appellant asserts that excluding him from participation in the district elections denies him equal protection of the laws. He contends that he and others of his class are substantially interested in and significantly affected by the school meeting decisions. All members of the community have an interest in the quality and structure of public education, appellant says, and he urges that "the decisions taken by local boards . . . may have grave consequences to the entire population." Appellant also argues that the level of property taxation affects him, even though he does not own property, as property tax levels affect the price of goods and services in the community.

We turn therefore to question whether the exclusion is necessary to promote a compelling state interest. First, appellees [13] argue that the State has a legitimate interest in limiting the franchise in school district elec-

---

[13] The Union Free School District No. 15 and each member of its board of education were named as defendants. The Attorney General of New York intervened as an appellee.

tions to "members of the community of interest"—those "primarily interested in such elections." Second, appellees urge that the State may reasonably and permissibly conclude that "property taxpayers" (including lessees of taxable property who share the tax burden through rent payments) and parents of the children enrolled in the district's schools are those "primarily interested" in school affairs.

We do not understand appellees to argue that the State is attempting to limit the franchise to those "subjectively concerned" about school matters. Rather, they appear to argue that the State's legitimate interest is in restricting a voice in school matters to those "directly affected" by such decisions. The State apparently reasons that since the schools are financed in part by local property taxes, persons whose out-of-pocket expenses are "directly" affected by property tax changes should be allowed to vote. Similarly, parents of children in school are thought to have a "direct" stake in school affairs and are given a vote.

Appellees argue that it is necessary to limit the franchise to those "primarily interested" in school affairs because "the ever increasing complexity of the many interacting phases of the school system and structure make it extremely difficult for the electorate fully to understand the whys and wherefores of the detailed operations of the school system." Appellees say that many communications of school boards and school administrations are sent home to the parents through the district pupils and are "not broadcast to the general public"; thus, nonparents will be less informed than parents. Further, appellees argue, those who are assessed for local property taxes (either directly or indirectly through rent) will have enough of an interest "through the burden on their pocketbooks, to acquire such information as they may need."

We need express no opinion as to whether the State in some circumstances might limit the exercise of the franchise to those "primarily interested" or "primarily affected." Of course, we therefore do not reach the issue of whether these particular elections are of the type in which the franchise may be so limited. For, assuming, *arguendo,* that New York legitimately might limit the franchise in these school district elections to those "primarily interested in school affairs," close scrutiny of the § 2012 classifications demonstrates that they do not accomplish this purpose with sufficient precision to justify denying appellant the franchise.

Whether classifications allegedly limiting the franchise to those resident citizens "primarily interested" deny those excluded equal protection of the laws depends, *inter alia,* on whether all those excluded are in fact substantially less interested or affected than those the statute includes. In other words, the classifications must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal.[14] Section 2012 does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise. The classifications in § 2012 permit inclusion of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions.[15]

---

[14] Of course, if the exclusions are necessary to promote the articulated state interest, we must then determine whether the interest promoted by limiting the franchise constitutes a compelling state interest. We do not reach that issue in this case.

[15] For example, appellant resides with his parents in the school district, pays state and federal taxes and is interested in and affected by school board decisions; however, he has no vote. On the other hand, an uninterested unemployed young man who pays no state or federal taxes, but who rents an apartment in the district, can participate in the election.

Nor do appellees offer any justification for the exclusion of seemingly interested and informed residents—other than to argue that the § 2012 classifications include those "whom the State could understandably deem to be the most intimately interested in actions taken by the school board," and urge that "the task of . . . balancing the interest of the community in the maintenance of orderly school district elections against the interest of any individual in voting in such elections should clearly remain with the Legislature." [16] But the issue is not whether the legislative judgments are rational. A more exacting standard obtains. The issue is whether the § 2012 requirements do in fact sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class. The requirements of § 2012 are not sufficiently tailored to limiting the franchise to those "primarily interested" in school affairs to justify the denial of the franchise to appellant and members of his class.

The judgment of the United States District Court for the Eastern District of New York is therefore reversed. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

APPENDIX TO OPINION OF THE COURT.

Section 2012, New York Education Law:

"A person shall be entitled to vote at any school meeting for the election of school district officers, and upon all other matters which may be brought before such meeting, who is: 1. A citizen of the United States.

"2. Twenty-one years of age.

---

[16] We were informed at oral argument, however, that a very small proportion of the eligible voters attend the meetings.

"3. A resident within the district for a period of thirty days next preceding the meeting at which he offers to vote; and who in addition thereto possesses one of the following three qualifications:

"a. Owns or is the spouse of an owner, leases, hires, or is in the possession under a contract of purchase or is the spouse of one who leases, hires or is in possession under a contract of purchase of, real property in such district liable to taxation for school purposes, but the occupation of real property by a person as lodger or boarder shall not entitle such person to vote, or

"b. Is the parent of a child of school age, provided such a child shall have attended the district school in the district in which the meeting is held for a period of at least eight weeks during the year preceding such school meeting, or

"c. Not being the parent, has permanently residing with him a child of school age who shall have attended the district school for a period of at least eight weeks during the year preceding such meeting.

"No person shall be deemed to be ineligible to vote at any such meeting, by reason of sex, who has the other qualifications required by this section."

MR. JUSTICE STEWART, with whom MR. JUSTICE BLACK and MR. JUSTICE HARLAN join, dissenting.

In *Lassiter* v. *Northampton Election Bd.*, 360 U. S. 45, this Court upheld against constitutional attack a literacy requirement, applicable to voters in all state and federal elections, imposed by the State of North Carolina. Writing for a unanimous Court, MR. JUSTICE DOUGLAS said:

"The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, *Pope* v. *Wil-*

*liams,* 193 U. S. 621, 633; *Mason* v. *Missouri,* 179 U. S. 328, 335, absent of course the discrimination which the Constitution condemns." 360 U. S., at 50–51.

Believing that the appellant in this case is not the victim of any "discrimination which the Constitution condemns," I would affirm the judgment of the District Court.

The issue before us may be briefly summarized. New York has provided that in certain areas of the State, local authority over public schools shall reside in "Union Free School Districts," such as the District involved here. In such areas, the qualified voters of the District annually elect members of a Board of Education and determine by vote the basic fiscal policy of the school system: they adopt a budget and in effect decide the amount of school taxes that shall be imposed upon the taxable real property of the District. State and federal grants provide some additional funds for the operation of the school system, but the only method by which the District itself may raise its own revenue is through such property taxes.[1]

Three classes of persons are qualified under New York law to vote in these school elections: (1) parents or guardians of children attending public schools within the District; (2) persons who own taxable real property within the District, and their spouses; and (3) persons who lease taxable real property within the District, and their spouses.[2] The appellant, a bachelor who lives with

---

[1] The District Court's statement to this effect has been explicitly reiterated and emphasized by the appellees, and the proposition is apparently conceded by the appellant. See N. Y. Educ. Law §§ 416, 1717, 2021; N. Y. Real Prop. Tax Law §§ 1302, 1306, 1308.

[2] New York's general age and residence requirements must also be met.

his parents and who neither owns nor leases any real property within the District, falls within none of those classes, and consequently is disqualified from voting despite the fact that he meets the general age and residence requirements imposed by state law. The question presented is whether, by virtue of that disqualification, the appellant is denied the equal protection of the laws.

Although at times variously phrased, the traditional test of a statute's validity under the Equal Protection Clause is a familiar one: a legislative classification is invalid only "if it rest[s] on grounds wholly irrelevant to achievement of the regulation's objectives." *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552, 556.[3] It was under just such a test that the literacy requirement involved in *Lassiter* was upheld. The premise of our decision in that case was that a State may constitutionally impose upon its citizens voting requirements reasonably "designed to promote intelligent use of the ballot." 360 U. S., at 51. A similar premise underlies the proposition, consistently endorsed by this Court,[4] that a State may exclude nonresidents from participation in its elections. Such residence requirements, designed to help ensure that voters have a substantial stake in the outcome of elections and an opportunity to become familiar with the candidates and issues voted upon, are entirely permis-

---

[3] See also *McGowan* v. *Maryland,* 366 U. S. 420, 425–426:

"The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

[4] *Pope* v. *Williams,* 193 U. S. 621; *Lassiter* v. *Northampton Election Bd.,* 360 U. S. 45, 51; *Carrington* v. *Rash,* 380 U. S. 89, 93–94, 96; see *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 666.

sible exercises of state authority. Indeed, the appellant explicitly concedes, as he must, the validity of voting requirements relating to residence, literacy, and age. Yet he argues—and the Court accepts the argument—that the voting qualifications involved here somehow have a different constitutional status. I am unable to see the distinction.

Clearly a State may reasonably assume that its residents have a greater stake in the outcome of elections held within its boundaries than do other persons. Likewise, it is entirely rational for a state legislature to suppose that residents, being generally better informed regarding state affairs than are nonresidents, will be more likely than nonresidents to vote responsibly. And the same may be said of legislative assumptions regarding the electoral competence of adults and literate persons on the one hand, and of minors and illiterates on the other. It is clear, of course, that lines thus drawn cannot infallibly perform their intended legislative function. Just as "[i]lliterate people may be intelligent voters," [5] nonresidents or minors might also in some instances be interested, informed, and intelligent participants in the electoral process. Persons who commute across a state line to work may well have a great stake in the affairs of the State in which they are employed; some college students under 21 may be both better informed and more passionately interested in political affairs than many adults. But such discrepancies are the inevitable concomitant of the line drawing that is essential to law making. So long as the classification is rationally related to a permissible legislative end, therefore—as are residence, literacy, and age requirements imposed with respect to voting—there is no denial of equal protection.

---

[5] *Lassiter* v. *Northampton Election Bd.*, 360 U. S., at 52.

Thus judged, the statutory classification involved here seems to me clearly to be valid. New York has made the judgment that local educational policy is best left to those persons who have certain direct and definable interests in that policy: those who are either immediately involved as parents of school children or who, as owners or lessees of taxable property, are burdened with the local cost of funding school district operations.[6] True, persons outside those classes may be genuinely interested in the conduct of a school district's business—just as commuters from New Jersey may be genuinely interested in the outcome of a New York City election. But unless this Court is to claim a monopoly of wisdom regarding the sound operation of school systems in the 50 States, I see no way to justify the conclusion that the legislative classification involved here is not rationally related to a legitimate legislative purpose. "There is no group more interested in the operation and management of the public schools than the taxpayers who support them and the parents whose children attend them." *Doremus* v. *Board of Educ.,* 342 U. S. 429, 435 (DOUGLAS, J., dissenting).

With good reason, the Court does not really argue the contrary. Instead, it strikes down New York's statute by asserting that the traditional equal protection standard is inapt in this case, and that a considerably stricter standard—under which classifications relating to "the franchise" are to be subjected to "exacting judicial scrutiny"—should be applied. But the asserted justification for applying such a standard cannot withstand analysis.

---

[6] Presumably the rationale for including lessees and their spouses in the electoral process is that the cost of property taxes is in many instances passed on from owner to lessee.

The Court is quite explicit in explaining why it believes this statute should be given "close scrutiny":

> "The presumption of constitutionality and the approval given 'rational' classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality." (Footnote omitted.)

I am at a loss to understand how such reasoning is at all relevant to the present case. The voting qualifications at issue have been promulgated, not by Union Free School District No. 15, but by the New York State Legislature, and the appellant is of course fully able to participate in the election of representatives in that body. There is simply no claim whatever here that the state government is not "structured so as to represent fairly all the people," including the appellant.

Nor is there any other justification for imposing the Court's "exacting" equal protection test. This case does not involve racial classifications, which in light of the genesis of the Fourteenth Amendment have traditionally been viewed as inherently "suspect." [7] And this statute is not one that impinges upon a constitutionally protected right, and that consequently can be justified only by a "compelling" state interest.[8] For "the Constitution of the United States does not confer the right of suffrage

---

[7] *Korematsu* v. *United States,* 323 U. S. 214, 216; *McLaughlin* v. *Florida,* 379 U. S. 184, 192.

[8] *Shapiro* v. *Thompson,* 394 U. S. 618, 634; cf. *NAACP* v. *Alabama,* 357 U. S. 449, 463.

upon any one . . . ." *Minor* v. *Happersett,* 21 Wall. 162, 178.

In any event, it seems to me that under *any* equal protection standard, short of a doctrinaire insistence that universal suffrage is somehow mandated by the Constitution, the appellant's claim must be rejected. First of all, it must be emphasized—despite the Court's undifferentiated references to what it terms "the franchise"—that we are dealing here, not with a general election, but with a limited, special-purpose election.[9] The appellant is eligible to vote in all state, local, and federal elections in which general governmental policy is determined. He is fully able, therefore, to participate not only in the processes by which the requirements for school district voting may be changed, but also in those by which the levels of state and federal financial assistance to the District are determined. He clearly is not locked into any self-perpetuating status of exclusion from the electoral process.[10]

Secondly, the appellant is of course limited to asserting his own rights, not the purported rights of hypothetical childless clergymen or parents of preschool children, who neither own nor rent taxable property. The appellant's

---

[9] Special-purpose governmental authorities such as water, lighting, and sewer districts exist in various sections of the country, and participation in such districts is undoubtedly limited in many instances to those who partake of the agency's services and are assessed for its expenses. The constitutional validity of such a policy is, it seems to me, unquestionable. And while it is true, as the appellant argues, that a school system has a more pervasive influence in the community than do most other such special-purpose authorities, I cannot agree that that difference in degree presents anything approaching a distinction of constitutional dimension.

[10] Compare *Lucas* v. *Forty-fourth General Assembly,* 377 U. S. 713, with *Reynolds* v. *Sims,* 377 U. S. 533. Since *Carrington* v. *Rash,* 380 U. S. 89, and *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, dealt with requirements for voting in general elections, those decisions do not control the result here.

status is merely that of a citizen who says he is interested in the affairs of his local public schools. If the Constitution requires that he must be given a decision-making role in the governance of those affairs, then it seems to me that any individual who seeks such a role must be given it. For as I have suggested, there is no persuasive reason for distinguishing constitutionally between the voter qualifications New York has required for its Union Free School District elections and qualifications based on factors such as age, residence, or literacy.[11]

Today's decision can only be viewed as irreconcilable with the established principle that "[t]he States have . . . broad powers to determine the conditions under which the right of suffrage may be exercised . . . ." Since I think that principle is entirely sound, I respectfully dissent from the Court's judgment and opinion.

---

[11] A comparison of the classification made by New York with one based on literacy, for instance, presumably would attempt to weigh the interest of the person excluded from voting against the reasonableness of the legislative assumption regarding his competence as a voter or his connection with the subject matter of the election. In such a speculative analysis precision is not attainable; for that very reason, it seems to me, the standard of adjudication should be a reasonably tolerant one. But even assuming such an analysis were attempted, it could not in my view justify drawing a constitutional line between the classification involved here and a literacy requirement. True, the appellant and persons in his class might be thought to have generally more ability to vote intelligently than do illiterates. On the other hand, illiterate citizens clearly have considerably more of a stake in the outcome of general elections than do the members of the appellant's class in the result of school district elections.