458 F.2d 649
 Pedro J. ROSARIO et al., Plaintiffs-Appellees,
v.
Nelson ROCKEFELLER, Governor of the State of New York, John
P. Lomenzo, Secretary of State of the State of New
York, Defendants-Appellants, Maurice J.
O'Rourke et al., Defendants.
Steven EISNER, on his own behalf and on behalf of all others
similarly situated, Plaintiffs-Appellees,
v.
Nelson ROCKEFELLER, Governor of the State of New York, et
al., Defendants-Appellants.
 Nos. 632, 633, Dockets 72-1182, 72-1183.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 24, 1972.
Decided April 7, 1972.
Certiorari Granted May 30, 1972.
See 92 S.Ct. 2062.
 
 Seymour Friedman, Brooklyn, N. Y., for plaintiffs-appellees Pedro J. Rosario, William J. Freedman and Karen Lee Gottesman, and others.
 A. Seth Greenwald, Asst. Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of N. Y., and Irving Galt, New York City, on the brief), for defendants-appellants Nelson Rockefeller and John P. Lomenzo and pro se pursuant to New York Executive Law Sec. 71.
 Burt Neuborne, New York Civil Liberties Union, New York City (Arthur Eisenberg, New York City, on the brief), for plaintiffs-appellees Steven Eisner, and others.
 J. Kemp Hannon, Mineola, N. Y. (Joseph Jaspan, County Atty. of Nassau County, Mineola, N. Y., on the brief), for defendants-appellants William D. Meissner and Marvin D. Christenfeld.
 Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Defendants below, New York State officials charged with enforcing section 186 of the New York Election Law which provides that voters in primary elections must have been enrolled in the party prior to the previous general election, appeal from Chief Judge Mishler's decision in the Eastern District declaring section 186 unconstitutional as a violation of plaintiffs' rights under the First and Fourteenth Amendments and the federal Voting Rights Act, 42 U.S.C. Sec. 1973, as amended 42 U.S.C. Sec. 1973aa. We reverse.
 
 
 2
 Section 186 is part of New York's comprehensive regulation of its electoral processes and, in particular, of its party primary elections. By law only enrolled party members can vote in their party's primary. New York Election Law Sec. 201. Section 186 is designed to ensure the integrity of the closed primary and provides that enrollment in a party for the purpose of voting in a primary election must take place prior to the general election previous to the primary.[1] The theory behind the statute is that such early enrollment will discourage "raiding," i. e., voters of one party fraudulently designating themselves as voters of another party in order to determine the results of the raided party's primary.
 
 
 3
 Plaintiffs here, all registered voters, failed to enroll as party members prior to the November 1971 general elections. The effect of section 186 is to exclude them from voting in the 1972 primary elections. Invoking the jurisdiction of the federal courts under 42 U.S.C. Sec. 1983, 28 U.S.C. Sec. 1343(3), Sec. 2281, and Sec. 2284, plaintiffs sought the convening of a three-judge court and requested declaratory and injunctive relief against the enforcement of section 186. Subsequently, they dropped their demand for injunctive relief, and, concomitantly, their request for a three-judge court.[2] The district court granted the requested declaratory relief on three grounds: that section 186 violated plaintiffs' Fourteenth Amendment rights to equal protection because raiding can be equally well or better prevented by New York Election Law Sec. 332 which provides for direct challenges to allegedly fraudulent enrollments, yet under which plaintiffs would not be kept from voting; that section 186 infringed the plaintiffs' First Amendment rights of association with other party members, yet advanced no compelling state interest, or failed to do so by the least drastic means; and that section 186 was in direct conflict with the federal Voting Rights Act Sec. 1973aa-1(d) which provides "each State shall provide by law for the registration . . . of all duly qualified residents . . . not later than thirty days immediately prior to any presidential election." We disagree.
 
 
 4
 The political parties in the United States, though broadbased enough so that their members' philosophies often range across the political spectrum, stand as deliberate associations of individuals drawn together to advance certain common aims by nominating and electing candidates who will pursue those aims once in office. The entire political process depends largely upon the satisfactory operation of these institutions and it is the rare candidate who can succeed in a general election without the support of the party. Yet the efficacy of the party system in the democratic process-its usefulness in providing a unity of divergent factions in an alliance for power-would be seriously impaired were members of one party entitled to interfere and participate in the opposite party's affairs. In such circumstances, the raided party would be hardpressed to put forth the candidates its members deemed most satisfactory. In the end, the chief loser would be the public.[3]
 
 
 5
 Section 186 is part of New York's scheme to minimize the possibility of such debilitating political maneuvers. Designed to prevent primary cross-over votes cast only to disrupt orderly party functioning, the statute requires that enrollment in the party be completed by a date sufficiently prior to the primary to decrease the likelihood of raiding. The Supreme Court has made clear that "prevention of [electoral] fraud is a legitimate and compelling government goal." Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). "[A] State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). And a candidacy determined by the votes of non-party members for purposes antagonistic to the functioning of the primary system is, in practical effect, a fraudulent candidacy. Given the importance of orderly party primaries to the political process, we hold that the prevention of "raiding" is a compelling state interest.[4]
 
 
 6
 Moreover, section 186 is carefully designed to infringe minimally on First and Fourteenth Amendment rights. The statute works indirectly to its end of having only voters in general sympathy with the party vote in that party's primary. By requiring enrollment some seven to nine months prior to the primary and also prior to the general election, it takes full advantage of the facts that long-range planning in politics is quite difficult and that neither politician nor voter wishes to give the impression that he is deliberately engaging in fraud. Thus the notion of raiding, its potential disruptive impact, and its advantages to one side are not likely to be as apparent to the majority of enrolled voters nor to receive as close attention from the professional politician just prior to a November general election when concerns are elsewhere as would be true during the "primary season," which, for the country as a whole, runs from early February until the end of June. Few persons have the effrontery or the foresight to enroll as say, "Republicans" so that they can vote in a primary some seven months hence, when they full well intend to vote "Democratic" in only a few weeks. And, it would be the rare politician who could successfully urge his constituents to vote for him or his party in the upcoming general election, while at the same time urging a cross-over enrollment for the purposes of upsetting the opposite party's primary. Yet the operation of section 186 requires such deliberate inconsistencies if large-scale raiding were to be effective in New York. Because of the statute, it is all but impossible for any group to engage in raiding. Allowing enrollment any time after the general election would not have the same deterrent effect on raiding for it would not put the voter in the unseemly position of asking to be enrolled in one party while at the same time intending to vote immediately for another.
 
 
 7
 Plaintiffs have argued, however, that even if the effectiveness of section 186 as a deterrent on raiding be established, still the statute must be struck down for it also keeps from voting in a primary the registrant who has only inadvertently failed to enroll prior to the general election and who has no intention of "raiding" one of the parties. Plaintiffs argue that section 332 of the Election Law which allows for a direct challenge to enrollees would be sufficient to accomplish the antiraiding purpose of section 186 and would, at the same time, allow the nonraiding late enrollee to vote in the primary. While it is true that section 186 and section 332 are aimed at the same evil of raiding, it is obvious that the use of 332 to prevent raiding would be far too cumbersome to have any deterrent effect on raiding in a primary. Cf. Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).
 
 
 8
 Section 332 is a narrowly drawn statute appropriate for striking from the enrollment rolls only one name at a time. Each such challenge requires a full judicial inquiry, with its high cost in money, time and manpower for the challenging party. Its efficacy, even in the single case is not clear for proof of a man's allegiance to one party or another is often difficult to secure. Unlike proof of residence, for which objective evidence, e. g., ownership of a dwelling, car registration, or a driver's license, is easily at hand, proof of allegiance to one party or another demands inquiry into the voter's mind. The very great majority of voters have no closer contact with their political party than pulling the lever or marking the ballot in the voting booth. In the absence of the availability of evidence regarding a voter's party preference and faced with large-scale raiding, party officials relying only on section 332 would be virtually impotent. By contrast, section 186 has a broad deterrent effect. The burden of change is placed upon the raider not the party and the statute requires the cross-over at a particularly difficult time. In requiring that the state use to a proper end the means designed to impinge minimally upon fundamental rights, the Constitution does not require that the state choose ineffectual means. We think section 186 is a proper means to safeguard a valuable state interest.[5]
 
 
 9
 We are supported in our conclusion by the Supreme Court's recent decision in Lippitt v. Cipollone, 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (1972). There the Court affirmed without opinion a decision of the Northern District of Ohio declaring constitutional Ohio Rev. Code Sec. 3513.191 which provides "[n]o person shall be a candidate for nomination or election at a party primary if he voted as a member of a different political party at any primary election within the next preceding four calendar years." Holding the statute constitutional the lower court found that it preserved "the integrity of all political parties and membership therein" by "prevent[ing] 'raiding' of one party by members of another party and [by] preclud[ing] candidates from '. . . altering their political party affiliations for opportunistic reasons."' Lippitt v. Cipollone, 337 F.Supp. 1405 (N.D.Ohio, 1971). The Supreme Court's affirmance indicates beyond dispute that the prevention of raiding is a compelling state interest and that a reasonable extended period of time before an enrollment can be changed is a proper means to halt this practice.[6]
 
 
 10
 Plaintiffs' final argument is that section 186 is in direct conflict with 42 U.S.C. Sec. 1973aa-1(d) which provides: "each State shall provide by law for the registration . . . of all duly qualified residents . . . not later than thirty days immediately prior to any presidential election . . . ." Plaintiffs argue that "presidential election" includes presidential primary. We disagree.
 
 
 11
 Section 1973aa-1(d) was passed as part of the Voting Rights Act of 1970. The statute itself makes no reference to primary elections speaking only of "voting for the offices of President and Vice President," Sec. 1973aa-1(a), or "vot[ing] for the choice of electors for the President and Vice-President," Sec. 1973aa-1(d) and the more usual meaning of "presidential election" is the quadrennial November election rather than the party primaries. On its face, then, the statute is not applicable to primary elections. The legislative history is silent on whether section 1973aa-1(d) was intended to apply to primaries. 1970 U.S.Cong. Code and Admin.News, pp. 3277, 3285. However, at the same time Congress enacted section 1973aa-1(d), it also passed into law section 1973bb reducing the voting age to eighteen in federal, state and local elections. See Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). In so doing, Congress specifically addressed itself to "voting in any primary or in any election." 42 U.S.C. Sec. 1973bb. The deliberate inclusion of the word "primary" here coupled with its absence in section 1973aa is further indication that Congress was not dealing with primaries in section 1973aa. We conclude that section 1973aa has no application to this case.
 
 
 12
 Reversed.
 
 
 
 [1]
 Section 186 provides:
 Sec. 186. Opening of enrollment box and completion of enrollment
 All enrollment blanks contained in the enrollment box shall remain in such box, and the box shall not be opened nor shall any of the blanks be removed therefrom until the Tuesday following the day of general election in that year. Such box shall then be opened by the board of elections and the blanks contained therein shall be removed therefrom by the board, and the names of the party designated by each voter under such declaration, provided such party continues to be a party, as defined in this law shall be entered by the board, opposite the name of such voter in the appropriate column of the two copies of the register containing enrollment numbers for the election district in which such voter resides. The enrollment blanks marked by voters, who enrolled before a central or veterans' absentee registration board shall at the same time be opened by the board of elections and the names of the party designated by each such voter shall likewise be entered by the board, provided such party continues to be a party, as defined in this law. If cross marks are found in more than one of the circles or if no cross marks are found in any of the circles of any enrollment blank, the voter who used the enrollment blank thus deficient shall not be deemed to be enrolled, and words indicating the reason why such enrollment is not transcribed shall be entered opposite the name of such voter in such copies of the register in the column reserved for the entry of party enrollments. When all of the enrollments shall be transcribed from the blanks to the register, the board of elections shall make a certificate upon the form printed in such registers, to the effect that it has correctly and properly transcribed the enrollment indicated on the blank of each voter to such registers. Such enrollment shall be complete before the succeeding first day of February in each year.
 
 
 [2]
 Defendants have argued that the district court had no power to refuse to convene a three-judge court even though plaintiffs had withdrawn their demand for injunctive relief. We disagree. The Supreme Court has said that section 2281 is not "a measure of broad social policy to be construed with great liberality, but . . . an enactment technical in the strict sense of the term and to be applied as such." Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800 (1941). Following this doctrine the Court has carefully differentiated between suits in which declaratory relief is requested and a three-judge court is not appropriate and those in which injunctive relief is requested and a three-judge court is required. Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Since plaintiffs abandoned their claim for injunctive relief at the district court level and prior to the trial, the district judge quite properly determined the issue. See Merced Rosa v. Herrero, 423 F.2d 591, 593 (1st Cir. 1970)
 
 
 [3]
 New York has a particular interest in preventing raiding. In addition to the major parties, Democrat and Republican, two minority parties, Conservative and Liberal, are established throughout the state and usually present a full slate of candidates in the general election. Yet as there are only 107,000 enrolled Conservatives and 109,000 enrolled Liberals as opposed to 2,950,000 enrolled Republicans and 3,565,000 enrolled Democrats, successful raiding of these minority parties would present little difficulty on a state-wide basis absent Sec. 186
 
 
 [4]
 Restrictions on the exercise of the franchise, dealing as they do with the fundamental rights of voting and association have been closely scrutinized by the courts; e. g., Dunn v. Blumstein, 404 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); William v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and primaries as well as general elections have been subjected to this exacting scrutiny, e. g., Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Smith v. All-wright, 321 U.S. 469, 64 S.Ct. 757, 88 L.Ed. 987 (1944); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)
 Applying this standard to our review of section 186, we find that the statute advances a compelling state interest and that it does so in a manner calculated to impinge minimally on First and Fourteenth Amendment rights.
 
 
 [5]
 New York does allow post-general election enrollment in certain cases. Section 187 of the Election Law allows late enrollment if, for example, the enrollee came of age after the past general election or if he was ill during the enrollment period. The import of section 187 is that New York is not opposed to later enrollment per se
 
 
 [6]
 Defendants have argued that the Supreme Court's dismissal for want of a substantial federal question of a case ostensibly raising the same issues as the instant case, Jordan v. Meisser, 405 U.S. 907, 92 S.Ct. 947, 30 L.Ed.2d 778 (1972), is controlling in this litigation. However, in Jordan v. Meisser, the New York Attorney General argued to the Court that the plaintiff Jordan had failed to utilize the provisions of section 187 of the New York Election Law under which he could have enrolled in a party after the general election in order to participate in the primary election. Section 187, however, allows post-general election enrollment only in narrowly-defined circumstances and none of the plaintiffs here has this alternate route of enrollment presently available to him