**Anne C. YALE et al.**

v.

**Harry F. CURVIN et al.**

**Civ. A. No. 4883.**

United States District Court,
D. Rhode Island.

July 18, 1972.

Malcom Farmer, III, John J. Pendergast, III, Harold C. Arcaro, Jr., Richard W. Zacks, Providence, R. I., for plaintiffs.

Robert K. McOsker, Providence City Solicitor, W. Slater Allen, Jr., Asst. Atty. Gen., Stephen F. Achille, Providence, R. I., for defendants.

Before McENTEE, Circuit Judge, PETTINE, Chief Judge, and DAY, District Judge.

## OPINION

PETTINE, Chief Judge.

This class action challenges Sections 17–15–24 and 17–16–8 of the Rhode Island election laws as violative of rights guaranteed under Article 1, Section 2 and the First and Fourteenth Amendments of the Constitution of the United States by unconstitutionally infringing on the right of association, equal protection and due process.

■ The plaintiffs seek declaratory and injunctive relief under 28 U.S.C. § 1343(3), (4), § 2284 and 42 U.S.C. § 1983.

Sections 17–15–24 and 17–16–8 prohibit any person from voting in the primary of any political party or signing nomination papers for candidates for primary nomination of any political party if, within the preceding 26 months, such person has voted in a primary or signed primary nomination papers for a candidate of another political party or has signed final nomination papers of any candidate for any elective office.[1]

The phrase "final nomination papers" refers to papers required of independent candidates for office. The phrase "primary nomination papers" refers to the nomination papers of a candidate of a particular political party for office. Such a candidate must obtain "primary nomination papers" whether or not he or she actually engages in a party primary contest; and such a candidate is not required to file any further nomination papers.

An independent candidate is any candidate for any office who is not running as a candidate of a "political party," i. e. a political organization whose candidate for governor obtained at least 5% of the vote in the preceding general election, R.I.G.L. § 17–1–2(f), i. e. the Republican and Democratic parties.

Primary elections for all offices other than President of the United States are held in September of each even year.

1. "17–15–24. Disqualification by activity in other party.—No person shall be entitled to vote in the primary election of any political party who within twenty-six (26) calendar months, has voted in a primary election as a member of any other political party or has signed final nomination papers of any candidate for any elective office, or has signed primary nomination papers for candidates of any other political party or who has been within twelve (12) calendar months a candidate on final nomination papers. No person who has voted in the primary as a member of any political party or has signed primary nomination papers for candidates of any political party or who has signed final nomination papers of any candidate for any elective office, shall be eligible to sign nomination papers for primary nominations of candidates of any other political party within twenty-six (26) calendar months thereafter.

No person shall be debarred from voting in his own party primary because of his signing a list of nomination papers to be voted for at said primary. But a person so signing a list of nomination papers shall be deemed to have taken part in the primary as a member of such political party, and shall be debarred from voting in the primary as a member of the opposite political party for a period of twenty-six (26) calendar months thereafter. The provisions of this chapter debarring persons who have signed nomination papers from voting or taking part in the primary shall not prevent those persons who have signed nomination papers for candidates under the designation of a political party not then recognized by this chapter from voting or taking part in the primary of such party when such an organization shall have become a political party and eligible to participate in the primaries herein provided, under the definition of § 17–1–2."

"17–16–8. Disqualification of signers from participation in primaries.—Any voter signing any such nomination paper is thereafter disqualified from participation in the primary of any political party for the succeeding twenty-six (26) months, as provided in § 17–15–24."

R.I.G.L. § 17–15–1. In the September, 1970 primaries, the plaintiffs in one manner or another, as set forth in the questioned sections, became participants in the election process of a party or of an independent candidate and now wish to vote in the 1972 primary of the opposite party.[2]

2. The plaintiffs and defendants entered into a stipulation of fact, the pertinent portions of which are quoted from the admitted paragraphs of the Amended Complaint:

"8. (b) Plaintiff Common Cause has more than 230,000 dues-paying members in the several states and the District of Columbia including more than 1,000 members in Rhode Island many of whom are Rhode Island registered voters. The plaintiff League of Women Voters of Rhode Island has more than 1,000 members who are enrolled in 15 local leagues and who are Rhode Island registered voters. The plaintiff League of Women Voters of the United States has approximately 160,000 members in 1,360 local and state leagues throughout the United States, including the plaintiff League of Women Voters of Rhode Island and its members. Each of the foregoing plaintiffs has long been active in efforts such as support of legislation, educating citizens and conducting studies to protect the full enjoyment of every citizen's right to vote, to encourage equal, free and extensive citizen participation in the American and Rhode Island electoral processes, including party primary elections, to prevent discrimination against qualified voters and to promote governmental responsiveness to the will of citizens through defending the integrity of the political process. Individual members of Common Cause, the League of Women Voters of Rhode Island, and the League of Women Voters of the United States are prohibited or deterred by the statutes challenged herein from signing nomination papers for candidates and/or from voting in primary elections of their choice. Thus said plaintiffs and their members have strong and direct organizational and/or personal interests in the successful prosecution of this matter."

"20. Plaintiff Morin voted in the Republican Party Primary in September of 1970 and desires to vote in the Democratic Party Presidential Primary to be held on May 23, 1972 and the Democratic Party Primary to be held on September 12, 1972, but is and will be prohibited from doing so unless said Section 17–15–24 is declared invalid and the defendants enjoined as prayed for herein. Further, plaintiff Morin signed nomination papers of candidates for Delegate to the 1972 Democratic National Presidential Nominating Convention and his signature thereon has been declared invalid by defendants, Providence Board of Canvassers."

"21. Plaintiff Yale signed nomination papers for a Democratic candidate and final nomination papers for an independent candidate in or about July, 1970 and desires to vote in the Republican Party Presidential Primary on May 23, 1972. The defendants, members of the Providence Board of Canvassers have caused the voting lists for the City of Providence to be marked to indicate that plaintiff Yale will be ineligible to vote in said 1972 primary by virtue of having signed said nomination papers and unless said Section 17–16–8 is declared invalid and the defendants enjoined as prayed herein, plaintiff Yale will be prevented from voting in said primary."

"22. Plaintiff Francis signed primary nomination papers for a Republican Party candidate for Mayor of the City of Providence, Rhode Island and signed final nomination papers for an independent candidate for Mayor of said city, all in or about July, 1970; desires to vote in the Democratic Party Presidential Primary on May 23, 1972 and in the Democratic Party Primary on September 12, 1972, and, if he is prevented from doing so by the defendants, he intends to refrain from voting in either Party's primaries in 1972 so that he will be free to vote in the primary of his choice in the 1974 elections. The defendants, members of the Providence Board of Canvassers have caused the voting lists for the City of Providence to be marked to indicate that plaintiff Francis will be ineligible to vote in said 1972 primary by virtue of having signed said nomination papers and unless said Section 17–16–8 is declared invalid and the defendants enjoined as prayed herein, plaintiff Francis will be prevented from voting in said primary."

"23. Plaintiff Fine voted in the Democratic Party Primary in September, 1970 and desires to vote in the Republican Party Presidential Primary on May 23, 1972. The defendants, members of the Providence Board of Canvassers have caused the voting lists

The thrust of the plaintiffs' position is that the 26-month restriction, absent a compelling state interest, cannot withstand constitutional muster of the First and Fourteenth Amendments to the United States Constitution. They contend that:

"The State has here failed to show any 'compelling interest' which justifies imposing such heavy burden on the right to vote and associate."

Williams v. Rhodes, 393 U.S. 23, 89 S. Ct. 5, 21 L.Ed.2d 24 (1967). And as the Supreme Court emphasized in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274, the state must show this law is *necessary* to promote a *compelling* interest. Plaintiffs argue that even if the state establishes that it has a compelling interest in preventing "raiding," a 26-month restriction is not necessary to promote that interest.

Though we do not have the benefit of a definitive United States Supreme Court pronouncement on the direct issue at stake, there have been established certain legal precepts fundamental to the entire elective process.[3] As stated in Nagler, et al. v. Stiles, et al.—Grossman, et al. v. Yeomans, et al., 343 F.Supp. 415 (D.N.J.1972):

"Primary elections, as well as general elections, are subject to state control but are also subject to constitutional scrutiny by Federal Courts. United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). When it is claimed that the State's control infringes upon the right to vote and the right of association, the burden is then on the State to show that such infringement is the result of the State's enforcement of a compelling interest, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Williams v. Rhodes, [393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1967)]; and that the State's interest could not be protected through less restricted means. *Dunn supra*; Pontikes v. Kusper, 345 F. Supp. 1104 (N.D.Ill., 1972)."

The state asserts that its interest is in preventing raiding of one party's primary by members of another party. This is a legitimate state interest, as was recognized in Pontikes v. Kusper, *supra*. There a three-judge court struck down a 23-month Illinois statute quite similar to the one at issue stating:

"The interest which section 7-43(d) is claimed to protect is the state's interest in guarding against any distortions of the electoral process in general and in maintaining the integrity of the two-party system in particular. The statute serves these interests by preventing a practice known as 'raiding.' 'Raiding' occurs when members of one party vote in the primary of another party for the sole purpose of bringing about the nomination of the

---

for the City of Providence to be marked to indicate that plaintiff Fine will be ineligible to vote in said 1972 primary by virtue of having so voted and unless said Section 17–15–24 is declared invalid and the defendants enjoined as prayed herein, plaintiff Fine will be prevented from voting in said primary." We note that as to the allegations contained in paragraph 8, the defendants, in their "third defense" of their answer, neither admitted nor denied its allegations. However, the stipulation of fact includes an admission by the defendants that the allegations of paragraph 8 are true.

3. See also Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (a state may not deny a bona fide resident the opportunity to vote because he is a member of the armed forces), Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (a state may not impose a poll tax); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) and City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (a state may not require citizens to own or lease taxable realty in order to vote in a local election); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (a state cannot refuse to permit persons living in a federal enclave to vote); Affeldt v. Whitcomb, 319 F.Supp. 69 (N.D.Ind.1970) (Three Judge Court) (a state may not impose a one year residency requirement).

weakest candidate. But the statute sweeps too broadly, impeding both deceptive conduct and constitutionally protected activities. If section 7–43(d) were not in effect, massive party switching could occur either because of the well-planned raiding of one party's primary by members of another party, or because of massive dissatisfaction with the prevailing policies of an existing party. The state's interest upon which this statute is grounded could be characterized as 'compelling' only if the former alternative is more likely to occur than the latter, or if raiding constitutes a more important danger than the danger to constitutionally protected rights however often it occurs. There is no evidence to indicate that raiding is more likely to take place than 'honest' switches of affiliation. Forty-four states do not impose post-election restraints on changing affiliation. This would indicate that raiding is not a serious threat to the multi-party system."

The defendants seek support in Rosario v. Rockefeller, 458 F.2d 649 (2d Cir. 1972) and Lippitt v. Cipollone, et al., 337 F.Supp. 1405 (N.D.Ohio 1971), aff'd 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (1972).

*Rosario* found a compelling state interest in the preservation of party integrity and upheld the constitutionality of a New York statute.[4] In *Rosario* the law requires a voter to enroll in the party in whose primary election he plans to vote, prior to the general election next preceding said primary election in the year following the general election. This imposes about a seven month restriction.[5]

Unlike the Rhode Island law, the New York law is narrow and does not disen-franchise a voter from a succeeding primary election. Furthermore, as argued by the plaintiffs, the New York law does not require a voter to forego his right to vote in a primary election in order to regain the full freedom to exercise that right in a succeeding primary election of a different party. This comports with the minimal infringement requirement of the First and Fourteenth Amendment rights. Thus *Rosario* supports our holding that Rhode Island's 26-month requirement is unduly restrictive.

Under Rhode Island law a voter who wishes to change party affiliation must skip one primary and abstain from partisan political activity to do so. *Rosario* permits a voter to change parties by changing registration; Rhode Island does not allow change of registration except by foregoing one primary. It appears to this Court that to require a voter to wait four years before he or she can switch parties in a primary election is an unwarranted and overbroad inhibition on the electorate's voting rights. In Rhode Island, as in New Jersey, the gubernatorial elections held every two years and/or special elections to fill vacancies do not always coincide with presidential elections. In these times of dominant national issues, evolving and changing with each shading of the international picture, it belies reality to ignore voters' shifting allegiances from one candidate to another rather than adherence to party lines.

"Our system of government is based on the consent of the governed, and such consent is only illusory when voters are prevented by artificial restrictions for significant periods of time from changing political parties even though events or the actions of elected representatives may have convinced the voter that a

---

4. "The efficacy of the party system in the democratic process—its usefulness in providing a unity of divergent factions in an alliance for power—would be seriously impaired were members of one party entitled to interfere and participate in the opposite party's affairs. In such circumstances, the raided party would be hardpressed to put forth the candidates its members deemed most

satisfactory. In the end, the chief loser would be the public."
Rosario v. Rockefeller, *supra*, 458 F.2d at 652.

5. Though the District Court declared this law unconstitutional, the decision was reversed by the Second Circuit on April 7, 1972.

change in party allegiance is warranted." *Gordon v. Executive Committee of Democratic Party*, 335 F.Supp. 166, 169 (D.S.C.1971)

The Rhode Island statutory scheme locks voters into one party both horizontally, for a twenty-six month period, and vertically, to all levels of government, local, state, and national. It inhibits growth of third parties and penalizes independents who wish to join parties and vote in their primaries. It places a premium on old guard party regularity, and hinders growth of diverse constituencies within a party. Thus the interests of individual voters are infringed in a wide variety of ways. To justify such a broad spectrum of burdens, the state offers only the single interest of preventing raiding.

In Rhode Island one who had voted in the Republican gubernatorial primary of 1970 was prohibited from voting in the 1972 Democratic presidential primary, however loyal and attached to the policies of one of the Democratic presidential aspirants. Justifying such a situation as preservation of multi-party system integrity is a distortion of what is necessary to fulfill a compelling state interest. It runs head on and unduly restricts the will of the electorate to make a viable political party primary choice in the heat of exigent political circumstances. The twenty-six month law is unreasonable and excessive. Further we fail to see what stopping someone who has signed an independent's nomination papers from voting in a party primary has to do with preventing raiding.

In reaching this conclusion, we are mindful that the United States Supreme Court in Lippitt v. Cipollone, 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (1972) affirmed a three-judge district court (Northern District of Ohio, Eastern Division) decision finding a compelling state interest in restrictions on candidates who voted in another party's primary within the previous four years.

In *Pontikes v. Kusper, supra*, the court, in speaking to this point, stated:

"The state's interest in maintaining a multi-party system has been found to be 'compelling' at the primary level only where constitutional claims were raised by *candidates* who were barred from running in one party's primary when they had voted in another party's primary within the previous two years, *Bendinger v. Ogilvie*, [335 F. Supp. 572 (N.D.Ill.1971)] or within the previous four years, *Lippitt v. Cipollone* [supra], and by *candidates* who were required to sign oaths affirming their support for the presidential and vice-presidential candidates of the party to which they claimed allegiance, *Ray v. Blair*, 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952).

Where—as in the instant case—the state's interest is weighed against the constitutional claims of political party *members*, the outcome has been different. In Williams v. Rhodes, [393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1967)], burdens on the right to form a party capable of effectively competing with other parties could not be justified by the state's interest in promoting a multi-party system. . . . Indeed, dicta in Bendinger v. Ogilvie, *supra*, specifically distinguished between the associational and voting rights of members of political parties and the rights of candidates:

'The state's interest in limiting candidates from switching parties, as detailed above, is greater than its interest in limiting voters from switching parties. The state's interest in preserving a vigorous and competitive two-party system is fostered by the requirement that candidates demonstrate a certain loyalty and attachment to the party in whose primary they are running; the same cannot be said of voters, however, who should be freer to demonstrate their changes in political attitude by voting for popular candidates or against unpopular candidates in any party's primary election.'

# 453

These cases cannot be distinguished by characterizing the state's interest in section 7–43(d) in terms of the protection of the electoral process rather than the preservation of the two-party system. The difference is semantic. Distortion of the electoral process would here be occasioned by a distortion of the procedures of candidate selection, namely, the selection procedures of a two-party system."

Inasmuch as the affirmance of Lippitt v. Cipollone, by the Supreme Court affirmed the validity of Ohio Rev.Code § 3513.19, it applies to restrictions on voters. Ohio permits a voter to change party membership by executing an affidavit affirming that the affiant voted for a majority of the candidates of the party with which he seeks affiliation at the last general election. Thus Ohio permits change of party registration by affidavit in a voter honor system and does not necessarily require a voter to forego a primary to change affiliation. It is a minimal infringement on voters' rights and is much less broad than the Rhode Island law.

We find such reasoning compelling and must conclude, as did the learned judges of the Pontikes v. Kusper court, that, "Whatever are the advantages of maintaining party stability for elections at any given level of government, they do not apply when national, state, and local contests are considered together. A voter ought not be required to hold himself bound to a single party on every level of government."

No evidence was introduced to show Rhode Island has ever experienced "raiding." Even were we to assume that the state has a compelling interest in preventing raiding, we would find this statute unconstitutional. We recognize the state has a legitimate interest in the prevention of raiding and merely hold that a 26-month restriction encompassing two primaries before a switch may be made in party affiliation is overly broad and thus infringes on the right to vote and association as prescribed in the First and Fourteenth Amendments to the United States Constitution.

*The Alleged Restriction on Candidacy*

Implicit in the second defense that the relief sought will permit cross candidacy filings is the conclusion that § 17–15–24 now prohibits such a procedure. This simply is not so. One must look to § 17–14–2 which, prior to 1968, read:

> "No person shall be eligible to file a declaration of candidacy, or be eligible to be a candidate, unless such person shall, at the time of filing such declaration, * * * be a *qualified voter eligible to vote at the primary of said political party.*" (emphasis added)

In 1968 this statute was amended by deleting the italicized portion and substituting therefor, " . . . be qualified to vote in a primary within the district for the office which he seeks."

It is inescapable the restriction on candidacy to voter eligibility in the primary of the same political party was removed. All that remains are the requirements of age, citizenship, and residence to be a qualified elector for office as set forth in Article IX, Section 1 and Amendment XXIX, Section 1.

It is adjudged and decreed:

1. That Sections 17–15–24 and 17–16–8 of the General Laws of the State of Rhode Island are in violation of the First and Fourteenth Amendments of the Constitution of the United States.

2. That the defendants, the members of the class which they represent, and their agents, servants, employees and attorneys and all persons in active concert and participation with them are hereby enjoined and restrained from enforcing the provisions of Sections 17–15–24 and 17–16–8 of the General Laws of the State of Rhode Island by preventing persons seeking to vote in a party primary on the ground that by virtue of said sections such person is deemed to be a member of another party.

3. That Harry F. Curvin, chairman of the Board of Elections of the State of Rhode Island shall furnish to all concerned election officials a notice setting forth the text of this injunctive order.