**July 30, 1991**

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

HERMAN S. SABLAN and ) ORIGINAL ACTION NO. 91-002
ANTONIO T. SALAS, )
 )
 Petitioner, )
 )
 vs. )
 )
SUPERIOR COURT OF THE )
COMMONWEALTH OF THE NORTHERN ) **ORDER DENYING MANDAMUS**
MARIANA ISLANDS, )
 )
 Respondent, )
 )
 and )
 )
ELOY INOS, DIRECTOR OF )
FINANCE; CNMI DEPARTMENT OF )
FINANCE; DIVISION OF REVENUE )
AND TAX; COMMONWEALTH )
GOVERNMENT, )
 )
 Real Parties In Interest. )
 )

Counsel for Petitioner: Robert J. O'Connor, Esquire
 P.O. Box 1969
 Saipan, MP 96950

Counsel for Respondents/ Robert C. Naraja, Attorney General;
Real Parties in Interest: Eric Smith, Assistant Attorney
 General
 2nd Floor Administration Building
 Capitol Hill
 Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice; HILLBLOM and ATALIG, Special
 Judges.

166

DELA CRUZ, Chief Justice:

Herman S. Sablan and Antonio T. Salas, both of whom are Commonwealth taxpayers, have petitioned this Court to issue a writ of mandamus against the Commonwealth Superior Court, which had denied their application for a temporary restraining order and injunction against the Commonwealth Government and its director of finance. They seek to enjoin the disclosure of their tax returns and return information to any person, including the United States Government or any of its officers and agencies.

## I.

On July 9, 1991, petitioners filed a complaint for declaratory and injunctive relief against the Commonwealth Government and its finance director. They allege that 4 CMC § 1701(d) prohibits the disclosure of their tax returns and return information to any person, including the U.S. Government or any of its agencies or officers. They moved for a temporary restraining order, which was heard and denied the next day.

In a three-page decision, the Superior Court denied the motion for a restraining order and injunction. It determined that the lawsuit was, in essence, one to enjoin the enforcement of 48 U.S.C. § 1681(b), through which federal statute the Inspector General of the U.S. Department of Interior ("IG") had announced its intention to conduct an audit of the Commonwealth's assessment and collection of income taxes.

"[S]ince any injunction ordered against the defendants has a direct bearing on the asserted statutory duty of the IG to audit the defendants," the court ruled that the IG is an indispensable party to the action and must be joined. Superior Court Order, July 10, 1991, at 2. "Failure to do so dictates a denial of plaintiffs' application for a restraining order or injunction." Id., at 3.

## II.

In reviewing the papers filed for and against the issuance of mandamus, we are guided by the factors discussed in Tenorio v. Superior Court, Original Action No. 89-002 (N.M.I. Nov. 14, 1989). "[O]nly exceptional circumstances amounting to a 'judicial usurpation of power' will justify the invocation of this extraordinary remedy." Id., at 6. "[T]he remedy of mandamus is a drastic one, to be involved only in extraordinary situations." Id. One seeking mandamus must show that the lower court order is clearly erroneous. Id. "If a rational and substantial legal argument can be made in support of the questioned . . . ruling, the case is not appropriate for mandamus . . . even though on normal appeal a reviewing court may find reversible error." Id., at 5.

## III.

The trial court denied the application for temporary restraining order (or injunction) because of the failure to join the IG as an indispensable party. We examine whether this ruling

is clearly erroneous.

A reading of the complaint, the application for temporary restraining order and its supporting papers indicate that what apparently triggered the filing of the lawsuit was the announcement by the IG to perform an audit of the Commonwealth's assessment and collection of income taxes. Petitioners are concerned that if the IG performs the intended audit, their individual tax returns and return information would be disclosed to the IG in violation of 4 CMC § 1701(d). They, therefore, seek an order enjoining the Commonwealth Government and the Director of Finance from disclosing such confidential information.

We are not convinced that, under our _Tenorio_ guidelines, the trial court was <u>clearly</u> erroneous in ruling that the IG is an indispensable party to the lawsuit.

Although the restraining order sought is not against the IG, but is rather against the Commonwealth Government, its aim is to ultimately prohibit the IG from reviewing petitioners' tax returns and return information. To that extent, there is an apparent conflict between 4 CMC § 1701(d) which prohibits the disclosure of tax returns and return information by the Commonwealth Government and 48 U.S.C. § 1681(b), the federal statute under which the IG announced its intention to audit all accounts pertaining to the revenue and receipts of the Commonwealth Government. It is this potential dilemma which presumably led the trial court to decide that the IG is an indispensable party, in order to have a complete resolution of the case.

169

In its response to the petition for mandamus, the Commonwealth Government states that the IG's announcement is one to conduct a "performance audit." It argues that the announcement "does not express an intention to audit Commonwealth income tax returns or tax information." Therefore, it contends that there is no basis for an injunction and the case is premature. We agree.

We also find that there has been no showing made by petitioners that the Commonwealth Government or its finance director will breach the non-disclosure provision of 4 CMC § 1701(d). Petitioners presume that such will be the case. Absent a showing that the IG would in fact seek disclosure of tax returns or return information, we fail to see how the statute would be violated. Further, there has been no showing that the finance director will, upon request by the IG, voluntarily turn over such documents in apparent violation of 4 CMC § 1701(d); nor has there been a showing that he will, if subpoenaed, turn such documents over to the IG.

During oral argument, the Commonwealth Government informed us that the IG is presently reviewing the Commonwealth Government's concern with respect to the non-disclosure provision of the statute. Whether those concerns would ultimately be addressed by the IG so as not to violate 4 CMC § 1701(d) is not yet known. For now, it is premature to presume otherwise.

## IV.

We, therefore, hold that the Superior Court was not clearly erroneous, as a matter of law, in denying the application for a restraining order (or injunction) for failure to join the IG as an indispensable party. Whether we ultimately, upon a regular appeal of the order denying the restraining order, would conclude otherwise (i.e. that the IG is not an indispensable party), is a matter which has little bearing on whether a writ should issue.

The petition for a writ of mandamus, therefore, is hereby DENIED.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
PEDRO M. ATALIG, Special Judge

171

HILLBLOM, Special Judge, Dissenting:

## I. BACKGROUND OF THE CASE

A. SUMMARY

Petitioners seek a writ of mandamus requiring the Superior Court of the Northern Mariana Islands to vacate its order requiring the Inspector General[1] be joined as an indispensable party (which might remove the action to the federal court), before considering the application for TRO and a permanent injunction to prohibit the director of revenue and taxation from disclosing their tax returns in violation of NMI law.[2] The denial of the petitioners motion is

---

[1] Inspector General, United States Department of Interior. **At the outset,** it should be noted that the people of the NMI, including the petitioners did not vote for anyone in the government which <u>created</u> the Department of Interior or would appoint the Inspector General; or who oversee the operations of that department.

[2] Although this dissent is lengthy my disagreement with the majority is not. The majority is concerned over the misuse of mandamus:

> . . . it [government] contends that there is no basis for an injunction and the case is premature. We agree.

> We also find that there has been no showing made by petitioners that the Commonwealth Government or its finance director will breach the non-disclosure provision of 4 CMC § 1701(d). Petitioners presume that such will be the case. Absent a showing that the IG would in fact seek disclosure of tax returns or return information, we fail to see how the statute would be violated. Further, there has been no showing that the finance director will, upon request by the IG, voluntarily turn over such documents in apparent violation of 4 CMC § 1701(d); nor has there been a showing that he will, if subpoenaed, turn such documents over to the IG.

> I, contrary to the majority, believe that the <u>threat is significant</u> if Director is faced with a subpoena.

not immediately appealable. The order requires the joinder of the Inspector General, rather than dismissing the suit. As a result, petitioners seek an extraordinary writ as the only available remedy. In addition, the Petitioners request this Court to order the trial court to enter a TRO and a permanent injunction prohibiting disclosure of petitioner's tax returns to the Inspector General except as provided under the laws of the Northern Mariana Islands, and for us to assume custody of CNMI tax returns to assure compliance with such an order. Petitioners maintain an injunction is necessary to prevent this controversy from becoming moot, in the event of compliance by the CNMI with the request of the Inspector General, before petitioners action to prevent disclosure of their tax returns is adjudicated.

More importantly, as will be discussed more fully below, petitioners argue that the mandatory joinder of the Inspector General[3] will very likely deprive petitioner of the NMI Courts as a forum.[4] The petition presents unique issues that go to the

_____

I also conclude that the record supports the conclusion that a subpoena by the IG will issue.

[3] This is not a case of the Inspector General suing the taxpayer asking for the returns in the custody of the government.

[4] People of the NMI do not elect anyone responsible for selecting or governing the District Court. For a discussion of democracy and the role of one man one vote in the judicial branch of government see Ronald Chism v. Charles E. Roemen, 91 C.D.O.S. 4637 decided June 20, 1991 by the Supreme Court of the United States.

rights of all NMI taxpayers and to the relationship between the CNMI and the United States under the Covenant. First, the United States seeks taxpayer returns currently in the hands of NMI. The issue becomes whether the tax returns sought are the property of the individual taxpayers or the property of the NMI government. Second, the issue requires us to resolve whether the federal judiciary can decide this case which involves strictly local matters, without impinging on the right of self government reserved in the people of the NMI pursuant to Section 103 of the Covenant and whether this is such a case.[5] The Covenant governs the political relationship between the NMI and the United States. In cases involving the Covenant, under a "traditional analysis," the United States would be a proper, if not indispensable party since it is a party to the Covenant. However, I believe that the Covenant precludes a traditional analysis. No United States involvement in the internal affairs of the NMI can violate the dictates of Section 103 and its guarantee of self government over internal and local affairs. Thus, even if the United States were to intervene or be added or party to an action its ability to remove the action to federal court should be limited to instances where doing so would not impinge upon self government. In the instant case involving the character of tax returns in the NMI and

---

[5] As will discuss latter it is important to remember that in 1978 the people of the NMI **reserved to themselves and did not grant to the United States** authority over local and internal matters. This means that no branch of the federal government is entitled to trespass across the **Covenant Section 103 border** unless otherwise permitted in the Covenant or by consent.

the conduct of NMI officials, federal removal would be contrary to Section 103 since the case involves a purely local matter.

## B. THE LEGISLATIVE AUTHORITY OF THE UNITED STATES TO IMPLEMENT ART. IV OF THE COVENANT INCLUDING INTERVENTION AND REMOVAL.

The legislative authority[6] of the United States to implement Article 4 of the Covenant is found in Covenant Section 105 which provides:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands . . . . In order to respect the right of self-government guaranteed by this Covenant, the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I (including Section 103), II, and III and Sections 501 (the incorporation by reference of certain provisions of the United States Constitution) and 805 may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands,

The primary restraint on the legislative power of the United States then requires defining "self-government" inasmuch as the legislative power of the United States in the NMI is limited to that which does not modify or violate "self-government" found in section 103.

---

[6] Covenant section 501 does not make applicable in the Northern Mariana Islands the Necessary and Proper Clause, Interstate Commerce Clause, or the Territorial Clause of the United States Constitution. These are the primary provisions of the Constitution which allow Congress to legislate on local and internal matters in the several states and classic territories. The Covenant does, however, incorporate the limited legislative powers to carry out the 13th, 15th, 19th, and 26th Amendments as Section 2 of those amendments are incorporated into Section 501 of the Covenant.

My analysis begins by noting that Covenant section 103 reserves to the people (not the government) of the Northern Mariana Islands the right of "self-government." The people govern themselves chiefly by exercising their voting rights. Accordingly, I conclude that "self-government" and the right to vote go hand-in-hand. The United States Supreme Court has provided a definition of the right to vote which can serve as a starting point for the definition of the right of "self-government." Justice Warren in Kramer v. Union Free School District No. 15, 395 U.S. 621 (1969), found that the plaintiff's right to vote was infringed because he was not allowed to participate in an election that involved matters he was substantially interested in and which substantially affected him. I, therefore, define self-government as the right of the NMI to determine matters in which NMI inhabitants are substantially interested in and affected by. Since NMI voters do not (and cannot) participate in Federal elections, self-government must confer legislative, executive and judicial authority in the persons they do vote for the officials of the NMI government.

In light of the Covenant's grant to the United States of authority over foreign affairs and defense in section 104, I find that section 103 reserved to the people of the Northern Mariana Islands authority over all internal matters in which the inhabitants are substantially interested and which substantially affect them, so long as those matters do not primarily involve

176

foreign affairs or defense.[7]

Independent grounds exist to preserve the right of self-government to the people of the Northern Mariana Islands. The right of self-government, defined as the right to elect those persons who govern, is so fundamental that it constitutes a peremptory norm of international law or jus cogens from which no derogation is permitted whether by treaty or domestic legislation. See generally Committee of U.S. Citizens in Nicaragua v. Reagan, 859 F.2d 929, 939, 940 (D.C. Cir. 1988). See also Jus Cogens: Compelling the Law of Human Rights, 12 Hastings Int'l. and Comparative Law Review, 411 (1989). The application of the doctrine of jus cogen to protect the right of self-government is particularly appropriate in the CNMI. As part of Trusteeship, the NMI was afforded all fundamental freedoms adopted by the United Nations, including Article 7 (equal protection) and Article 21 (the right to participate in government through freely chosen

---

[7] The Covenant has a few specific exceptions to this rule. The Covenant also allows Congress to make applicable:

 (a) except as otherwise provided in Section 506, the Immigration and Naturalization laws of the United States;

 (b) except as otherwise provided in Subsection (b) of section 502, the coastwise laws of the United States and any prohibition in the laws of the United States against foreign vessels, landing fish, or unfinished fish products in the United States; and

 (c) the minimum wage provisions of Section 6, Act of June 25, 1938, 52 Stat. 1062, as amended.

See also, Covenant section 501 incorporating by reference the 13th, 15th, 19th, and 26th amendments' legislative power.

representatives) of the International Bill of Human Rights and the United Nations Charter. Art. 7 and Art. 21 are peremptory norms of international law and the application of federal law in derogation of self-government would violate such peremptory norms.

Having concluded that Congress may enact legislation implementing Article 4 of the Covenant which does not violate Covenant section 103 reservation of the right of self-government and having defined "self-government" I conclude that the Inspector General, if allowed to intervene, may not remove this case to a Federal Court. He may intervene on the condition that he does not remove.

## C. APPLICATION OF ARTICLE III AND SUPREMACY CLAUSE, OF THE UNITED STATES CONSTITUTION.

To complete my analysis of the relationship of this Court to the Federal courts, we must determine if other authority, other than Article IV allows removal.

The Federal courts are granted final authority "over" state courts because of the Supremacy Clause of the United States Constitution and the application of Article III of the United States Constitution. Article III grants the Supreme Court jurisdiction to decide all "cases, arising under this Constitution, [and] the Laws of the United States." Ableman v. Booth, 16 L.Ed. 169.

Article III and the Supremacy Clause[8] of the United States

---

[8] This Constitution and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be

Constitution (including the provision "and the Judges in every States shall be bound thereby,") do not apply in the NMI and do not govern the relationship between the Northern Mariana Islands and the United States. See Covenant, section 501. These provisions grant the federal courts final authority over state courts in the sense that federal courts decide what is or is not a federal question and can ultimately decide that federal question. In lieu of the Supremacy Clause, Covenant section 102 provides:

> The relations between the Northern Mariana Islands and the United States will be governed by this Covenant which, together with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands will be the supreme law of the Northern Mariana Islands. (Emphasis added.)

The Covenant's "supremacy clause" does not contain the "judicial supremacy" section found in the U.S. Constitution's Supremacy Clause. The unique relationship and division of authority created by the Covenant, whereby the people of the Northern Mariana Islands retained authority over local and internal matters in section 103 and granted the United States authority over foreign affairs and defense in section 104 prevents either judiciary controlling the other in any manner other than that

----

the Supreme Law of the Land; and the Judges in every State shall be bound thereby, and any Thing in the Constitution or Laws of any State to the contrary notwithstanding. U.S. Const., Supremacy Clause, Art. VII, cl. 2.

provided for in Article IV of the Covenant.[9]

## II.

## FACTS OF THE CASE

On July 9, 1991, petitioners filed an action in Superior Court requesting a TRO and for the court take custody of their tax returns (res in this action) and for permanent injunction against the Department of Finance and the Government of the Northern Mariana Islands prohibiting them from disclosing tax information except as required by the laws of the Northern Mariana Islands under the authority reserved over local and internal matters found in Section 103 of the Covenant . The parties argued the merits of the injunctive relief. The basic dispute of the parties centered around how "clear and present" or imminent the danger was that tax returns would be disclosed. Petitioners argued that the threat to their fundamental right to privacy was sufficient to constitute the need for relief.[10] The respondents argued that the threat of the violation of petitioners rights was not sufficient to justify the

---

[9] If differences in judicial opinions occur, the Covenant provides for resolution of differences, pursuant to Covenant section 902.

[10] See Vaughn v. Bank of Guam, 1 N.Mar.I. 58, 62: "(I)t is manifestly impermissible for Congress to pass a law that places a case arising under the laws of the Commonwealth beyond the reach of the people or the legislature of the Commonwealth" Wabol v. Villacrusis, 1 N.Mar.I. 19 at 22; Borja v. Goodman, (concurring beginning 79), 1 N.Mar.I. 63; Sablan v Iginoef, (concurring beginning 155) 1 N.Mar. I. 146.

injunctive relief[11] requested and that petitioner's request that the Court take custody[12] of the tax returns to enforce its order was not authorized by law. The lower court made no determination on the requested relief. Rather, sua sponte and without the benefit of argument by the litigants, it determined that the Inspector General was an indispensable party to this action.[13] (See *Order Denying Application for Temporary Restraining Order or Injunction*, Civil Action No.1 91-734). Based upon the indispensable party finding, the lower court noted that the joinder of the Inspector General would result in removal of the action to a federal forum. Instead of dismissing the action for failure to join an indispensable party, the trial court order gives rise to

---

[11] The majority relies on the assurance by the government that it will not disclose tax returns in violation of NMI law. Contrary to the position of the majority I believe that when faced with the specter of contempt the director will be put in the dilemma acknowledged by the Court in Blaz discussed at page 24 called the "untenable dilemma". The majority might also be relying on CNMI Const. Art. 1, Sec. 10 which may grant a "Bivens" cause action against the Director if he discloses the tax returns. See *Poreten v. University of San Francisco*, 64 Cal.App. 3825 (1971).

[12] The government opposed custody on the grounds that it would disrupt the operations of the department. Custody of the res (the tax returns) need not disrupt the operations of the department because the returns could physically remain with the department and the department continue its business as usual.

[13] The court concludes that the action is in fact an injunction against 48 USCA § 1681(b). This conclusions assumes (without authority or discussion) among other things that the plaintiffs returns are an 'account' of the Northern Mariana Islands and that the statute applies to the returns of the plaintiffs. The court assumes without argument or authority that the United States under its own constitution could enact and implement 48 USCA § 1681(b) in a manner to extend to individual tax returns of the petitioners without violating the principles of "one man one vote." These are substantial issues of a fundamental nature and cannot be "assumed" away as the court impliedly does.

181

the strong possibility of depriving the courts of the NMI of jurisdiction over the dispute. To preserve their choice of forum and to require a determination on the merits of the claim, the petitioners filed this writ.

## III.

### NECESSITY FOR ISSUANCE OF WRIT OF MANDAMUS

In <u>Tenorio v. Superior Court</u>, 1 N.Mar.I. 4, we determined under what conditions a writ of mandamus may issue. The five guidelines laid out were as follows. First the party seeking the writ has no other adequate means, such as direct appeal, to attain the relief desired. Second, the petitioner will be damaged or prejudiced in a way not correctable on appeal. Third, the lower court's order is clearly erroneous as a matter of law. Fourth, the lower court's order is an oft-repeated error, or manifest a persistent disregard of applicable rules and fifth, the lower court's order raises new and important problems, or issues of law of first impression. <u>Tenorio</u>, supra at 7. The <u>Tenorio</u> court went on to state: The considerations are cumulative, and proper disposition will often require a balancing of conflicting indicators" <u>Tenorio</u>, supra at 7-8. In another case involving the issuance of a writ of mandate this court stated "We place greater weight on the first two guidelines. <u>Mafnas v. Inos</u>, N.Mar.I 43, 45.[14]

---

[14] The parties dispute whether a TRO or permanent injunction should issue in this case but agreed (at oral argument) that the Inspector was not an indispensable party.

The petition is structured in a way that two separate and distinct issues are involved. The first is whether the order itself is a basis for issuing the writ and secondly whether the underlying requests for TRO and permanent injunction should issue. I shall first address the order.

In applying the principles of Tenorio and Inos to the facts and circumstances in this case I find that the party seeking the writ has no adequate means other than a writ to determine whether this case may proceed without joining the Inspector General since the failure to dismiss precluded an appeal.[15] In addition, if the case were removed to a federal forum the petitioners have alleged that there is a substantial likelihood the case will become moot precluding appeal. This is exactly what happened in two similar[16] cases. In United States of America, ex rel. v. Sablan, Civil No. 89-0008 (D.C.NMI, 1989), there was a similar request to audit a different agency of the NMI government. In that case, the NMI began discussions with the Inspector General concerning the power of the Department of Interior to interfere with the internal affairs of the NMI. The District Court in an opinion which treated the covenant as a unilateral agreement creating a political union,

---

[15] If the Superior Court had dismissed with leave to amend then there would have been an appealable order.

[16] This case differs from MIHA in one substantial respect. In MIHA the government was seeking accounts or property of the government of the NMI. This case involves tax information and property of the Petitioners and not of the government.

decided the **Covenant** was **a federal law not a local law,**[17] and that self-government in Section 103 is apparently no more than the right to elect a "straw" government. Without any discussion the District Court assumed that the U.S. Congress and Executive could override the will of the people of the NMI on any and all matters with the exception of the naked existence of the positions of government. In a broad ruling, the District Court sought to change the Covenant from a bilateral agreement creating and governing the political union between the United States and the NMI to a wholly unilateral document giving the United States carte blanche authority to legislate for the NMI.[18] The court concluded Covenant section 105[19] explicitly provides that the:

---

[17] It is an agreement between both parties that is enforceable it provides for legislative implementation of certain provisions by both the United States and the NMI. The fact that the Covenant, as an agreement, was approved by a joint resolution of Congress does not change the agreement forming a political union into a federal law. What is law is the resolution approving the Covenant and making parts self-executing.

[18] Given the clear position of the District Court, a position I view as totally at odds with the history and intent of the Covenant there is no reason to believe that if this case is removed to that court a result will be any different than that in Sablan.

[19] The Court in Sablan fails to understand the role and purpose of section 105 of the Covenant. The role of this section is to provide the "power" to legislate in light of the fact that section 501 did not make applicable the Necessary and Proper Clause, the Territorial Clause, or the Interstate Commerce Clause, (the primary provisions which authorize Congress to enact legislation). The Covenant, however, does incorporate the limited legislative powers to carry out the 13th, 15th, 19th, and 26th Amendments as section 2 of those amendments are incorporated by reference. Section 105 authorizes Congress to legislate in the Northern Mariana Islands to carry out its rights and obligations under the Covenant.

184

'United States may enter legislation in accordance with its **constitutional processes which will be applicable to the Northern Mariana Islands.**' The only (emphasis added) restriction on this right is that if such legislation is not applicable to the several states, the NMI 'must be specifically named in the legislation for it to become effective here. It was clearly intended by both governments in section 105 that every (emphasis in original) law would apply to the Commonwealth if the law was applicable 'to the several states." . . . . All federal laws applicable to the several states will automatically apply in the CNMI. Moreover, the U.S. Congress can go further and make applicable to the CNMI federal laws which it could not make applicable to the several states.

If the above were true the Covenant would become a treaty of cession.[20] This is the manner in which the United States obtained most of its territories. If the Northern Mariana Islands was intended to be merely a territory, the Covenant would have only two operable provisions (sections 101 and 105). The rest of the document and the provisions therein would be meaningless. What would become of section 501 of the Covenant which states "Other provisions of or amendments to the Constitution of the United

---

The Necessary and Proper Clause of the United States Constitution provides a similar function as providing for legislative powers in carrying out the United States Constitution.

Section 104 grants the United States authority over foreign affairs and defense. Section 104 does not authorize enacting legislation. It is section 105 which authorizes the United States to enact legislation to carry out its authority in section 104 or other provisions of the Covenant.

[20] In the Treaty of Peace (Treaty of Paris of 1898), 30 Stat. 1754, T.S. No. 343, Spain ceded Puerto Rico and Guam to the U.S.

The Virgin Islands were ceded to the U.S. in two separate documents, the Treaty of Cession of Tutuilla and Aunuu, April 17, 1900, and the Treaty of the Cession of Manu'a Islands, July 16, 1904.

States, which do not apply of their own force within the Northern Mariana Islands will be applicable within the Northern Mariana Islands **only** with the approval of the Government of the Northern Mariana Islands and the Government of the United States." (Emphasis added.)[21]

If the _Sablan_ decision is correct, why does the Covenant provide rights to the United States pursuant to Section 104? What is the role and purpose of section 502 and its phrase "and amendments thereto" if Congress already had that power pursuant to section 105? Why the need for section 503 giving the Congress the right to enact and make applicable United States immigration laws? What purpose does section 604(a) serve by granting Congress the power to levy excise taxes on goods manufactured, sold or used or services rendered in the Northern Mariana Islands serve if the _Sablan_ interpretation of section 105 is correct? If section 105 is to be read as expansively as the _Sablan_ court believes, there is only one significant section to the Covenant, section 105. Obviously, the drafters of the Covenant intended to give meaning to the document in its entirety and the Covenant must be read and

---

[21] See Sutherland Stat. Const., section 46.06:

> "It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.

interpreted as a whole.[22]

The Sablan court rhetorically asks "What, then is to be made of the guarantee of 'self-government' found in Covenant section 103? The answer given by the court seems to conclude this right is no more than a right to elect a local government whose legislation the federal government can always override; and this apparently is possible without giving the inhabitants of the NMI a right to vote for the federal officials who would control their lives.[23] The Sablan court views the NMI as nothing more than a territory of the

---

[22] The Sablan court reaches its result by ignoring the "statutory" history and purpose of the Covenant in carrying out the charter and Trusteeship Agreement. The Sablan court de-emphasizes the plain meaning of section 103 and 104 reserving "self-government" and granting authority over foreign affairs and defense. To justify its position, the Sablan court states that by voting for the Covenant, the people of the NMI ratified the language of the Covenant as interpreted by the Sablan court. This justification defies a reasonable interpretation of what the people of the NMI believed the Covenant stated. After voting for "self-government" in section 103, what reasonable person would conclude that section 501 language stating "of its own force" meant the United States had unfettered authority to legislate in the NMI by virtue of the Territorial Clause, article 4, Section 3, clause 18. Such authority is the anti-thesis of "self-government."

[23] The idea that the unelected federal legislature could enact legislation which affects the day to day lives of the inhabitants does violence to the United States Constitution as laid out in Kramer, supra, as a violation of the right to vote. See Sutherland Stat. Const., section 45.11:

> As a corollary of favoring constitutionality, the fact that **one among alternative constructions** would involve **serious constitutional difficulties** is a reason to reject that interpretation in favor of another. It has even been said that "strained construction" is not only permissible, but desirable, if it is the only construction that will save constitutionality.

187

United States, a view that has no historical basis,[24] "no legal basis"[25] and no basis under the Covenant.

The district court in its zeal to establish federal authority[26] denied a request for a stay pending appeal. Facing contempt MIHA complied. By the time the appeal reached the Ninth Circuit it was moot because MIHA had complied. Thus, the controversy could never be decided on the merits, a situation

---

[24] The United Nations Charter and Trusteeship Agreements (the predecessor treaties to the Covenant) primary purpose was to avoid such a result. The only "history" for supporting the Sablan interpretation appears in the process of "approval" in Congress **long after** the Covenant was signed.

[25] See Ngiraingas v. Sanchez, 849 F.2d 372 (1989) at 375 fn. 1: (affirmed in Ngiraingas v. Sanchez, 1990 U.S.W.I., 48277 (U.S.).

Guam's relationship with the United States Government distinguishes this case from Fleming v. Department of Public Safety, 837 F.2d 401 (9th Cir. 1988) . . . CNMI has a unique relationship with the United States; the original Trusteeship Agreement obligated the United States to "promote the development of the inhabitants of the Trust Territory toward self-government or independence, " see "Trusteeship Agreement for the Former Japanese Mandated Islands, July 18. 1948, art. 6, section 1, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S 189, quoted in Fleming, at 403. Significantly, the "United States does not possess sovereignty over the Trust Territory "but merely" exercises powers of administration, legislation and jurisdiction . . . pursuant to an agreement with the United Nations." (citations) Guam's relationship to the United States is entirely different. Guam has no separate **sovereign status, unlike the CNMI; it "is subject to the plenary power of Congress and has no inherent right to govern itself. . ."** (Emphasis added.)

[26] The District Court established in 1978 prior to any rights obtained by the United States in Section 101 and 104 cannot be an Article IV court. It is on Article 1 Court in that it is established as necessary and proper implementation of the Covenant. However, Congress in implementing Article IV limited the term of the District Court to 10 years, not like Puerto Rico, where judges have life tenure, the subtle pressures for reappointment are an unfortunate aspect of Congress implementation of Art. IV. of the Covenant.

similar to that faced by petitioners here if the ruling of the lower court is not reversed. As the foregoing discussion demonstrates the petitioners have met the first two guidelines set forth in Tenorio.

In United States of America v. Joaquin Blaz, Civil No. 90-0010 District Court of Guam, the district court stated in an order denying a stay to prevent mootness:

> The Guam Department of Revenue and Taxation (DRT) has petitioned this Court for a stay of its Order Enforcing the subpoena of the Inspector General's Office of the Department of Interior (IG). DRT requests the stay to preclude further proceedings by IG auditors pending resolution by the Ninth Circuit Court of Appeals of the legality of the IG'S audit. The legality of the audit has been thoroughly reviewed.
>
> DRT insists that denial of the stay will place it on the horns of a dilemma. On the one side, if DRT in the interim complies with the Court Order then the confidentiality of Guam's taxpayers will be jeopardized and the appeal made moot by disclosure of taxpayer information. On the other side, DRT faces the untenable option of denying the Court's Order and inviting contempt. Thus, DRT insists that a stay issue.
>
> This Court, unconvinced of any threat to DRT's legitimate area of concern, hereby DENIES THE STAY.
>
> Mootness does not threaten to vitiate standing. Because DRT's opposition to the audit is founded upon the principle of IG overview -- a principle which permeates circumstances not faced in the instant case -- the issue is one which is "capable of repetition but evading review." United States Environmental Protection Agency v. Alyeska Pipeline . . . [b] because it would be difficult to fully contest the validity of each subpoena in subsequent actions because of the need for prompt response to the subpoenas, the case is 'capable of repetition' . . .
>
> This provides standing as an exception to the mootness doctrine. Therefore, the dilemma which was posited by DRT is illusory and the balance of hardships or the threat of irreparable injury to do not counsel a stay.

189

Because of the failure to grant a stay by the district court, DRT complied; and the appeal taken to the Ninth Circuit was dismissed as moot because DRT had complied.

The third factor is whether the order is clearly erroneous as a matter of law. The failure of the lower court to dismiss the case for failure to join an indispensable party was erroneous as a matter. Com.R.Civ.P. 12(h) provides that:

> Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter the court **shall** dismiss the action (emphasis added).

The trial court order would jeopardize its subject matter jurisdiction by requiring the mandatory joinder of the Inspector General. As such, it should have dismissed the case. See, Mays v. Pioneer Lumber Corp., 502 F.2d 106, 110 (41974).

Petitioners clearly meet the first three guidelines of Tenorio that discussion of the fourth and fifth guidelines is unnecessary. Inos, supra, at 45.

## IV.

### The Inspector General Has No Authority Under 48 U.S.C. § 1681(b) To Examine or Audit Individual Income Tax Returns Filed by Residents of the CNMI

Having established that the petition for writ of mandamus should have been granted and that the Inspector General was not an indispensable party, I shall examine whether under 48 U.S.C. § 1681(b) the Inspector General has the right or authority to examine the tax returns of individual CNMI taxpayers.

## A. Individual Taxpayer Returns are Not "Accounts of" the CNMI

In 48 U.S.C. § 1681(b), the Inspector General is given the " . . . authority to audit all accounts pertaining to the revenue and receipts of the governments of . . . the Northern Mariana Islands." Nowhere in the statute is there any grant of specific authority to examine income tax returns filed by individual taxpayer-citizens of the CNMI.[27] Indeed, in order for the court below to conclude that the Inspector General is an indispensable party to these proceedings, that court must have inferred that such individual taxpayers' tax returns are "accounts . . . of" the CNMI, a conclusion which has no basis in law or common sense.

It is not disputed that in the CNMI, individual tax returns are confidential. See Art. 1, Sec. 10 NMI Const. and 4 CMC § 1701. Petitioners, like all taxpayers in the CNMI, file their income tax returns with the understanding and expectation that the information contained therein will be held strictly confidential as between themselves, individually, and the people they elect and the taxing authority of the CNMI government. See Troglione v. McIntyre Aviation, Inc., 60 F.R.D. 511 (W.D.P2. 1973): "Income tax returns have an element of confidentiality and their production will not be routinely required."

More recently, the Ninth Circuit in Long v. U.S. Internal Revenue Service, 825 F.2d 225, 228 (9th Cir. 1987), refused to permit disclosure of individual income tax return information in a

---

[27] Statutes infringing on fundamental rights should be narrowly construed. CNMI Constitution Art. I, § 10, 4 CMC § 1701.

191

ruling which is particularly relevant to the facts of this case. In _Long_, the Court refused to compel disclosure of ZIP Code information in connection with an IRS taxpayer compliance measurement program on the grounds that tax return information which identifies a particular taxpayer is exempt from disclosure and need not be disclosed. This was so even though the disclosure sought was merely of the first three digits of the taxpayers' ZIP Code, the Court observing that some ZIP Code areas are so small that the disclosure requested could likely result in identifying individual taxpayers.

The confidentiality protected in the above cases (and numerous others) supports is a recognition of the individual's proprietary rights in the return he files, NMI Const. Art. I, § 10 and 4 CMC § 1701(d), and the information contained therein. As such, they are the taxpayer's return, not an account of or a property of the CNMI under 48 U.S.C. § 1681(b). The privacy rights of individual taxpayers are so strongly protected, that there should be no disclosure of tax return information unless a compelling NMI interest is shown for disclosure of such specific information.

**B. There is no Justification for the Disclosure of Individual Tax Returns to the Inspector General**

The filing of income tax returns and return information by individual CNMI taxpayers are matters inherently between each individual CNMI citizen and his elected government. The U.S. Government, through the Inspector General or any federal officer

192

has no basis to dilute this confidential relationship. Indeed, under the Covenant, there is no federal authority or basis for federal scrutiny of local tax returns. This is a matter of local self-government which, pursuant to Covenant § 103 and 4 CMC § 1701(a) of the Covenant, is outside the province of the U.S. Government.

For U.S. Government officials to intrude into the relationship between CNMI taxpayers and the CNMI government would be an intrusion on the concept of self-government, as guaranteed by the Covenant. See Kramer, supra.

## D. The Lower Court Should Have Granted the Injunctive Relief Sought by Petitioners.

From the above analysis, certain fundamental principles relating to this controversy emerge. The right of individual taxpayers to confidentiality regarding their tax returns is protected in the CNMI by specific statute and by our constitutional right to privacy. The information in their returns belongs to the taxpayer and is not an account of (or belonging to) the CNMI. Such individual return information is, therefore, not available to the Inspector General under 48 U.S.C. § 1681(b). Thus, the statute does not apply.

Finally, unlike Guam, CNMI income taxpayers receive a rebate of 95% of income taxes paid. The income tax revenue from any individual taxpayer is minute compared to the intrusion on a taxpayer's privacy by disclosure in violation of NMI law.

Accordingly, the lower court should have enjoined the CNMI

Dept. of Finance from disclosing such information.

## V.

## PROTECTION OF SOVEREIGNTY INDEPENDENT GROUNDS

Indeed, independent grounds exist for the issuance of a writ of mandamus in order to protect the internal authority and sovereignty of the NMI. See, In Re Debs, 158 U.S. 508, 584 (1895); and United States v United Mine Workers of America, 330 U.S. 258 (1947). The issuance of a writ of mandamus in this case will protect the internal sovereignty of the NMI and the courts created by the people of the NMI pursuant to the reserved right of self government. It must be remembered that in the document of political union the people reserved and did not grant to the United States authority over local and internal matters in Section 103. In this sense the Covenant is not unlike a deed of conveyance. The United States cannot take that which it did not receive in the Covenant. The people of the Northern Mariana Islands reserved this authority and sovereignty in 1978. See, Covenant § 103.

I would vote to grant the writ.

_____
LARRY L. HILLBLOM, Special Judge

194