203 N.J. Super. 118 (1985)
495 A.2d 1362
STEPHEN ABRAMOWITZ, INDIVIDUALLY; REMUS REALTY CORP., A NEW JERSEY CORPORATION D/B/A ARCORP PROPERTIES; NATIONAL BRANDS OUTLET OF SECAUCUS, INC., A NEW JERSEY CORPORATION, D/B/A N.B.O., THE NEW JERSEY CITIZENS FOR SUNDAY SHOPPING, AN ASSOCIATION NOT-FOR-PROFIT; BERTE INCORPORATED, A NEW JERSEY CORPORATION D/B/A BODY WORX, AND KATHLEEN REDDEN BIGGIANI, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND THOMAS F.X. SMITH, CLERK OF THE CITY OF JERSEY CITY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 12, 1985.
Decided July 26, 1985.
*120 Before Judges MATTHEWS, FURMAN and HAVEY.
Joseph E. Irenas argued the cause for appellants (McCarter & English, attorneys; Mr. Irenas and William T. Reilly, of counsel; Messrs. Irenas, Reilly and John F. Brenner, on the briefs).
Andrea M. Silkowitz, Deputy Attorney General, argued the cause for respondent Attorney General (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Ms. Silkowitz and Michael R. Cole, First Assistant Attorney General, of counsel and on the brief).
Barbara Tapper-Catrillo, Assistant Corporation Counsel, argued the cause for respondent Smith (Joseph Healy, Corporation Counsel, attorney; Ms. Tapper-Catrillo, Eugene P. O'Connell and Joanne Monahan, Assistant Corporation Counsel, on the brief).
Pattella & Plaia, attorneys for amicus curiae Hudson County Merchants' Council (Christopher L. Patella, of counsel; Mr. Patella and Thomas S. Plaia, on the brief).
*121 PER CURIAM.
Plaintiffs, who include a resident of Hudson County, but not of Jersey City, a land developer, and a retail business operating in parts of Hudson County other than Jersey City, and a nonprofit organization of Bergen and Hudson County retailers opposed to the Sunday Closing Law, challenged the validity of L. 1984, c. 160, an amendment and supplement to the Sunday Closing Law, N.J.S.A. 2A: 171-5.8 to -5.18. They named the Attorney General and Jersey City's clerk as defendants.
The operative facts involved in this appeal are set forth in the trial court's opinion which is reported at 200 N.J. Super. 303 (Law Div. 1984). Plaintiffs contend that the amendment is unconstitutional "special" legislation and that it violates constitutional guarantees of equal protection. According to them, it interferes with the fundamental constitutional right to vote because it operates to dilute the voting power of non-Jersey City, Hudson County voters and of Jersey City voters who oppose Sunday sales. Because plaintiffs contend that a fundamental right is involved, they argue that the challenged enactment is subject to strict scrutiny and must serve a compelling state interest in order to be sustainable.
Some equal protection challenges to voting laws focus on the denial of a particular group's right to vote, while others concern improper apportionment, which enables equal numbers of constituents to vote for proportionately unequal numbers of constituents. The present case is different. Plaintiffs are not contending that non-Jersey City voters should be able to vote in the Jersey City referendum. Instead, they argue that one class of voters now enjoys a special privilege that it did not have before: the right to vote in a separate city-wide referendum in addition to the county referendum. It is reasonably arguable that exercise of that privilege may tend to dilute the voting strength of members of the remaining classes that were not singled out for special treatment. However, since the elections in question are referenda, in which each voter's expression of will is direct, the matter of equal representation of voters who *122 cannot decide matters directly is not at issue here, as it is in apportionment cases.
Cases concerning denial of qualification of the right to vote (rather than malapportionment) include, for example, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), in which the United States Supreme Court invalidated a law prohibiting members of the military who moved to Texas from voting in state elections; Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), in which it invalidated Tennessee's long-duration residency requirement for voting, and Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), in which it invalidated Virginia's statute imposing a poll tax in state elections because it drew lines qualifying the right to vote based on affluence, a standard inconsistent with equal protection. In Harper the Court applied strict scrutiny because exercise of the "fundamental right" to vote had been restrained. (The classification was also highly suspect because it was based on wealth. In Dunn, the right to travel, as well as the right to vote, had been burdened.) Similarly, the New Jersey Supreme Court applied strict scrutiny in Worden, et al. v. Mercer Cty. Bd. of Elections, 61 N.J. 325, 346 (1972), when it invalidated the Mercer County election board practice of preventing college and university students residing in the county from registering to vote there.
Strict scrutiny is also usually applied to legislation limiting the right to vote in special-purpose elections to those voters who are deemed to have a particular interest or stake in the outcome. E.g., Cipriano v. Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647, 651 (1969); Kramer v. Union Free School Dist., 395 U.S. 621, 627, 89 S.Ct. 1886, 1889-1890, 23 L.Ed.2d 583, 589 (1969). But see Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (under the special circumstances of that case, only minimal scrutiny was required, and the vote restriction was upheld); accord, Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) (following Salyer). In Kramer, *123 for example, the Court invalidated a New York law permitting only parents of local public school pupils and owners of taxable realty in the district to vote in certain school district elections.
The Supreme Court explained in Kramer why the usual presumption of constitutionality could not apply. The presumption is "based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality." 395 U.S. at 628, 89 S.Ct. at 1890, 23 L.Ed.2d at 590.
In both Cipriano and Kramer the Court subjected the challenged laws to strict scrutiny even though the elections they governed were not of the type in which there was a constitutional right to vote. The elections at issue in Cipriano were referenda. In Kramer the Court subjected the New York law to "exacting judicial scrutiny" even though "under a different statutory scheme, the offices subject to election might have been filled through appointment." 395 U.S. at 628-629, 89 S.Ct. at 1890, 23 L.Ed.2d at 590. It emphasized that once the Legislature determined to enfranchise the electorate, it was obligated not to draw lines inconsistent with equal protection. Ibid. Plaintiffs rely on that principle in the present case. They acknowledge that there is no fundamental right to a referendum, Cafe Gallery, Inc. v. State, 189 N.J. Super. 468, 474 (Law Div. 1983), but maintain that once the Legislature established a right to decide the Sunday sales issue by county referendum, it was bound to make no distinctions between counties or within a county that were inconsistent with equal protection. We think that Kramer and similar cases are clearly distinguishable from the case before us.
Here there is no discrimination among voters within the geographic area holding the referendum  a city of the first *124 class in a county that bans Sunday sales. All voters within such a city may vote in the referendum, not just merchants, for example, who might have a special stake in the outcome of the referendum issue. The Jersey City referendum was not a county election in which only Jersey City residents were considered sufficiently affected by the issue to have the right to vote. It was a city referendum in which no registered Jersey City voters were barred from participating because of insufficient stake in the outcome.
Strict scrutiny was unnecessary in Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), in which residents of Holt, an unincorporated community located beyond the city limits but within the police jurisdiction of Tuscaloosa, argued that state statutes violated their rights to equal protection and due process by permitting Tuscaloosa to exercise police jurisdiction over them without giving them a right to vote in city elections. Plaintiffs wanted the Court either to invalidate the statutes authorizing the city to exercise police power over them or to extend the right to vote in municipal elections to residents of the police jurisdiction. 439 U.S. at 65, 99 S.Ct. at 387, 58 L.Ed.2d at 299. While the Court recognized some "logical appeal" in plaintiffs' "claimed right to vote in Tuscaloosa elections," it rejected plaintiffs' argument that they had a constitutional right to vote in them. 439 U.S. at 70, 99 S.Ct. at 390, 58 L.Ed.2d at 302. The case was therefore distinguishable from Kramer and its progeny, on which plaintiffs had relied. 439 U.S. at 67-70, 99 S.Ct. at 388-389, 58 L.Ed.2d at 299-302. In those cases, the challenged legislation had disenfranchised persons within the geographical boundaries of the governmental entity holding the elections. Since it did not view Holt as a voting rights case requiring strict scrutiny, the Court applied minimal scrutiny and found a rational basis for statutes allowing the city to exercise extraterritorial municipal powers over bordering areas.
A law that merely affects voting, without actually denying the right to vote or depriving voters of equal representation, *125 is usually not subject to strict scrutiny. For example, the Supreme Court upheld an Illinois statute providing that while medically incapacitated voters could receive absentee ballots, "judicially incapacitated" voters, i.e., certain categories of defendants in jail without bail, could not. McDonald v. Bd. of Elec. Comm'rs of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). It applied minimal scrutiny because it determined that the statute merely restricted the right to receive ballots, but did not deny anyone the right to vote. 394 U.S. at 804-805, 89 S.Ct. at 1406, 22 L.Ed.2d at 743.
Minimal scrutiny is also sufficient when the challenged law is reform legislation that merely "extends" the right to vote, instead of restricting or denying it. In Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), for example, New York City voters challenged the section of the federal Voting Rights Act of 1965 providing that persons who completed sixth grade in Puerto Rico may not be denied the right to vote because of inability to read or write English. This federal law prevented New York from enforcing its English literacy requirement for voting. 384 U.S. at 644-645, 86 S.Ct. at 1720, 16 L.Ed.2d at 831-832.
The Court viewed the challenged provision as "reform" legislation designed to further the aims of the Equal Protection Clause by eliminating an existing barrier to exercise of the right to vote. 384 U.S. at 652-657, 86 S.Ct. at 1724-1727, 16 L.Ed.2d at 836-839. Since it "does not restrict or deny the franchise, but in effect extends the franchise to persons who otherwise would be denied it by state law," it was not subject to "the closest scrutiny of distinctions in laws denying fundamental rights." 384 U.S. at 657, 86 S.Ct. at 1727, 16 L.Ed.2d at 839. According to the court, the limitation of this reform measure to persons educated in "American-flag" schools, i.e., schools within the United States jurisdiction, was rational. The statute was "not invalid because it might have gone farther than it did." Ibid., quoting Roschen v. Ward, 279 U.S. 337, *126 339, 49 S.Ct. 336, 73 L.Ed. 722, 729 (1929). It was proper for Congress to make the reform "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Katzenbach, 384 U.S. at 657, 86 S.Ct. at 1727, 16 L.Ed.2d at 839, quoting Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955).
Sometimes a classification may require more than minimal scrutiny even though it affects voting only indirectly. In Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), prospective candidates in a primary election for county offices challenged the constitutionality of state-mandated high filing fees which they could not afford to pay. Although the filing-fee law did not directly affect the fundamental right to vote, as did the poll taxes invalidated in Harper, supra, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169, the Court concluded that because it had "a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate," it should have more than just a rational basis. 405 U.S. at 142-144, 92 S.Ct. at 855-856, 31 L.Ed.2d at 99-100. It held that the law must be "`closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." 405 U.S. at 144, 92 S.Ct. at 856, 31 L.Ed.2d at 100.
We conclude that neither strict nor intermediate scrutiny is applicable to the present case. The challenged law does not deprive anyone of the right to vote. Nor does it produce a disparity in the power to vote for representatives who can carry out the voters' will only indirectly. Because it concerns the right to vote in a referendum, which is only statutory, not constitutional, it does not indirectly affect a fundamental right in a substantial enough way to require even intermediate scrutiny.
*127 Although it is somewhat closer to cases like Kramer, in which the right to vote was limited to a group alleged to be particularly interested, this case is distinguishable because in those cases, the law operated to discriminate among eligible voters within the district holding the election. Here, instead, the Legislature attempted to recognize the special needs and interests of politically distinguishable geographic areas  the state's largest cities  and, because of their perceived specialness, gave them a right to hold their own separate referenda.
The enactment may also be viewed as "reform" legislation. Even where a fundamental right is implicated, reform legislation may be sustainable if it is merely rationally related to a legitimate governmental interest, even if it does not go as far as it might, e.g., by including other cities which might also benefit from the privilege of holding their own separate referenda on Sunday sales.
As supplemented by the foregoing, we affirm the judgment of the Law Division substantially for the reasons expressed in its reported opinion.