726 A.2d 1004

ORTLEY BEACH PROPERTY OWNERS ASSOCIATION ET AL., PLAINTIFFS, v. FIRE COMMISSIONERS OF DOVER TOWNSHIP FIRE DISTRICT NO. 1, DEFENDANT/THIRD–PARTY PLAINTIFF, v. DOVER TOWNSHIP FIRE DISTRICT NO. 2, NEW JERSEY STATE ASSOCIATION OF FIRE DISTRICTS, INTERVENORS.

VOLUNTEER FIREMEN'S INSURANCE SERVICES, INC., INTERVENOR/THIRD–PARTY PLAINTIFF, v. THE DEPARTMENT OF COMMUNITY AFFAIRS OF THE STATE OF NEW JERSEY, THIRD–PARTY DEFENDANT.

Superior Court of New Jersey
Law Division Ocean County

Decided July 29, 1998.

*James J. Guida*, for plaintiffs.

*Robert C. Shea*, for defendant Fire Commissioners of Dover Township Fire District No. 1 (*Shea & Novy*, attorneys).

*Edwin C. Landis, Jr.*, for defendant Volunteer Firemen's Insurance Services (*Meyner & Landis*, attorneys).

*Richard M. Braslow*, for defendant Dover Township Fire District No. 2 and New Jersey State Association of Fire Districts.

SERPENTELLI, A.J.S.C.

In this Action in Lieu of Prerogative Writs the plaintiffs, Ortley Beach Property Owners Association and Daniel Polifroni, ask the court to declare unconstitutional certain portions of Chapter 388 of the Public Laws of 1997. That law created the Length Of Service Award Program (hereinafter "LOSAP") for fire or first aid organizations. The legislation was enacted in response to an Attorney General's opinion declaring existing LOSAP programs for volunteer fire districts to be without statutory foundation and this

court's opinion, dated December 11, 1997, which reached the same conclusion.

As initially proposed, the legislation introduced in the Senate did not contain any language relating to existing LOSAPs or a provision allowing voters to determine whether a LOSAP should be established within their municipality or fire district. Subsequently the Bill was amended to provide that before any LOSAP program could be initiated, it must be authorized by a municipal ordinance or fire district resolution and, thereafter, approved by the voters.[1]

On December 11, 1997, the Senate Bill was again amended to exempt existing LOSAPs from both the governmental authorization or voter approval requirements. As a result of the exempting language of Section 11(b), the residents of Fire District No. 1 (hereinafter "FD1") and any similarly situated fire district are not entitled to vote upon whether existing LOSAPs should be continued. The legislation also declared existing LOSAPs to be "valid in all respects from program inception", thereby making that which the court declared illegal to be legal. Section 11(b) also provides that the participants whose rights vest subsequent to the effective date of the LOSAP legislation shall receive a benefit not in excess of $750 a month, while members whose rights vested prior to the effective date with benefits in excess of $750 a month shall have the benefits frozen at their present level. The result of that provision is that members of FD1 and other similarly situated districts whose rights have vested and who may be receiving substantially higher benefits would be entitled to receive that level upon retirement or to continue to receive it if they are already retired.

---

[1] For simplicity, this opinion will refer to the LOSAP in the setting of a fire district adoption. However, unless otherwise noted, the opinion is intended to refer to both fire districts and municipalities in its findings of fact and conclusions of law.

Finally, Section 11(c) retroactively validates the defined benefit plan in FD1 and other similar plans, but requires all newly created LOSAPs to be "defined contribution" plans. As a result of that exemption, there is no cap on the amount of the annual budget allocation for LOSAPs in exempted fire districts since market factors and operating costs will dictate the annual appropriation necessary to fund the guaranteed benefit when the members retire.

The legislation is challenged on three grounds. Plaintiffs claim:

1. that the portion of Section 11 exempting existing LOSAPs from the requirement of being voted upon as a public question violates the due process and equal protection guarantees of the New Jersey Constitution and the United States Constitution;

2. that the Section 11 exemption constitutes "special legislation" in conflict with Article IV, Section VII, Paragraph 9(8) of the New Jersey Constitution; and

3. that the provisions of Section 11 validating LOSAPs "from program inception" violate the due process guarantees of the New Jersey Constitution and the United States Constitution.

The court will address the three issues raised in the order above.

## I. VOTER APPROVAL

All parties agree that the evaluation of substantive due process and equal protection claims under the Federal Constitution involves analysis of different tiers or levels of review. Where a fundamental right or suspect class is involved, the statute is subjected to strict scrutiny. *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 364–65, 526 *A.*2d 1055 (1987). Under such scrutiny, the statute must be found to further a compelling state interest and there must be no less restrictive means of accomplishing that objective. *Id.* at 365, 526 *A.*2d 1055. When the statute relates to a semi-suspect class, it is examined under intermediate scrutiny and, in order to be sustained, it must be substantially related to the achievement of an important governmental objective. *Id.* If the legislation does not affect either a suspect or semi-suspect class and does not attempt to regulate a fundamental right, then it need only be shown that it is rationally related to a legitimate State interest. *Id.*

■ Regarding the plaintiffs' assertion of an equal protection violation under the New Jersey Constitution, Article I, Paragraph 1, the New Jersey courts have rejected the three-tier analysis in favor of a balancing test. *Greenberg v. Kimmelman,* 99 *N.J.* 552, 567, 494 *A.*2d 294 (1985); *Right to Choose v. Byrne,* 91 *N.J.* 287, 308–09, 450 *A.*2d 925 (1982). The factors to be considered in that test include "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg,* 99 *N.J.* at 567, 494 *A.*2d 294.

The plaintiffs argue that the right to vote is a fundamental right guaranteed by both the State and Federal Constitutions and thus the exemption of existing LOSAPs from referendum requirements qualifies for a strict scrutiny analysis. Therefore, they assert that because the challenged statute grants the right to vote in a limited purpose election to some voters and denies it to others, the court must determine whether the exclusions are necessary to promote a compelling State interest. They rely heavily upon *Kramer v. Union Free School District,* 395 *U.S.* 621, 89 *S.Ct.* 1886, 23 *L.Ed.*2d 583 (1969) and *Cipriano v. City of Houma,* 395 *U.S.* 701, 89 *S.Ct.* 1897, 23 *L.Ed.*2d 647 (1969) to support their contention.

The plaintiffs maintain that there is no compelling State interest which should preclude voters in existing LOSAP districts from voting on the issue of whether the LOSAPs should be continued in their districts. They assert that the residents of the LOSAP districts have a substantial interest in that decision and are no less affected than residents of other fire districts. Finally, the plaintiffs claim that the referendum exemption for existing LOSAPs fails even under a rational basis test because denying the right to vote to members of communities where LOSAPs exist at the time of the passage of the statute is not rationally related to any legitimate legislative goal. Since there is no loss of benefits to those volunteers who have been vested by virtue of the grandfathering provisions of the statute, the plaintiffs see no licit objective to be achieved by denying the residents of LOSAP communities the right to vote on the prospective continuation of the LOSAP.

The defendants argue that the legislation is sustainable under a rational basis analysis and should not be subjected to any higher degree of scrutiny. It is asserted that the right to vote, which is recognized as fundamental for constitutional purposes, is distinct from a statutorily authorized right to participate in a referendum which is subject to only a rational basis test. Being created by statute, defendants deduce that the right to vote is not constitutionally protected unless the statutory classification is irrational.

The defendants claim that three rational bases exist for the delineation in Section 11. First, it is intended to assist fire districts in attracting and retaining volunteer fire fighters. Second, the legislation is designed to recognize and protect the expectation of those individuals in districts which have existing LOSAPs that they will receive a pension. Third, it was crafted so that there would be no disparity among communities with existing LOSAPs and equally no disparity among communities without LOSAPs. The defendants note that all the residents of every fire district are free to terminate the LOSAP in the same manner it was created, namely through the adoption of a resolution to put the issue to a public vote and the electorate's decision to eliminate the program.

Several of the defendants assert that the decision in *Abramowitz v. Kimmelman*, 203 *N.J.Super.* 118, 495 *A.*2d 1362 (App.Div. 1985) is essentially dispositive of this case. They contend that *Abramowitz* stands for the proposition that, unlike a constitutionally protected right to vote, laws creating voting rights in the nature of a referendum do not deprive anyone of the right to vote when some are granted the right and others are excluded, as long as the distinction is reasonable. They note that *Abramowitz* holds that the right to vote in a referendum does not affect a fundamental right in such a substantial manner as to require either close or intermediate scrutiny.

*Abramowitz* involved a challenge to the constitutionality of an amendment to the Sunday closing law (*N.J.S.A.* 2A:171–5.8 to 5.28) which allowed cities of the first class in counties where

Sunday sales were banned to vote again to determine whether Sunday sales would be permitted in those cities. The plaintiffs challenged the law on the grounds that residents of cities not of the first class were being deprived of a similar right to vote. The court sustained the amendment holding, as noted, that the Act gave the right to vote to everyone residing in cities of the first class, that it did not affect a right subject to strict or intermediate scrutiny, and that the classification adopted by the Legislature was rational.

Reasoning from *Abramowitz*, the defendants argue that since the vote involved in the LOSAP statute was legislatively created and since only a referendum was involved, the plaintiffs could not complain of being deprived of their right to vote. The difficulty with the defendants' argument is that this aspect of the *Abramowitz* decision, which appears to be dicta, seems to conflict with United States Supreme Court cases holding that even though a right to vote is statutorily created, it still may be a fundamental right.

In *Kramer v. Union Free School District*, 395 *U.S.* 621, 89 *S.Ct.* 1886, 23 *L.Ed.*2d 583, a New York statute limiting the right to vote in school district elections to owners or lessees of property and parents and guardians of school children was held unconstitutional because the method for determining voter eligibility was not necessary to promote a compelling state interest and, therefore, was invalid under the strict scrutiny analysis. In *Cipriano v. City of Houma*, 395 *U.S.* 701, 89 *S.Ct.* 1897, 23 *L.Ed.*2d 647, a Louisiana law giving only "property taxpayers" the right to vote in elections called to approve revenue bonds issued by a municipal utility authority was declared unconstitutional as denying equal protection. Again, the Court applied the strict scrutiny test, despite the fact that the questions scheduled for elections were not constitutionally mandated to be decided by the voters, and held that there was no showing that the exclusions were necessary to promote a compelling State interest. Thus, this court is unpersuaded that the statute granting the right to vote to some fire district resi-

dents and denying it to others can be sustained merely on the grounds that the vote involved was not constitutionally created. However, the inquiry does not stop there.

■ In addressing the constitutionality of a legislative classification, initially the court must examine the rationality of the line drawn. If there is a just and reasonable connection between the purpose of the legislation and the classification, the legislative action is beyond judicial review. The Court, in *David v. Vesta Co.*, 45 *N.J.* 301, 212 *A.2d* 345 (1965), summarized the guiding principles relating to the analysis of the classification as follows:

> The rules for judicial review of a legislative classification which is challenged as a denial of equal protection are well settled. The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and therefore purely arbitrary. The constitutionality of a legislative classification is presumed, and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal protection clause forbids only invidious discrimination.
>
> [45 *N.J.* at 314–15, 212 *A.2d* 345.]

*See Harvey v. Essex County Bd. of Freeholders*, 30 *N.J.* 381, 394, 153 *A.2d* 10 (1959); *Jamouneau v. Harner*, 16 *N.J.* 500, 520, 109 *A.2d* 640 (1954)

■ At the outset, it must be recognized that the Legislature is better situated than the courts to make policy decisions regarding matters of health, safety and welfare. *Brown v. City of Newark*, 113 *N.J.* 565, 571, 552 *A.2d* 125 (1989). As a result, the courts may not substitute their judgment for that of a legislative body, at least when the enactment is reasonably related to a legitimate public interest. *Williamson v. Lee Optical of Okla.*, 348 *U.S.* 483, 487, 75 *S.Ct.* 461, 99 *L.Ed.* 563, *reh'g denied*, 349 *U.S.* 925, 75 *S.Ct.* 657, 99 *L.Ed.* 1256 (1955). The Supreme Court has noted that the Constitution presumes that even improvident decisions will be rectified eventually by the democratic process so that judicial intervention usually is unwarranted "no matter how unwisely we

may think a political branch has acted". *Nordlinger v. Hahn*, 505 *U.S.* 1, 17–18, 112 *S.Ct.* 2326, 120 *L.Ed.*2d 1 (1992).

Thus, it has been said:

Generally state legislatures are presumed to have acted within their constitutional power despite the fact that in practice their laws result in inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*State in the Interest of K.V.N.*, 116 *N.J.Super.* 580, 587, 283 *A.*2d 337 (App.Div. 1971), *aff'd* 60 *N.J.* 517, 291 *A.*2d 577 (1972).

*Abramowitz* highlights the threshold issue in this case regarding the Legislature's right to create reasonable classifications. The court acknowledged the holdings in *Kramer*, 395 *U.S.* 621, 89 *S.Ct.* 1886, 23 *L.Ed.*2d 583, and *Cipriano*, 395 *U.S.* 701, 89 *S.Ct.* 1897, 23 *L.Ed.*2d 647. However, the court felt that the classification was distinguishable from both of those cases in which the statute had actually discriminated among voters within the same geographic area by allowing some to vote and excluding others from participating. *Abramowitz* concluded that the amendment under review did not discriminate between voters within the geographic area holding the referendum, namely, a city of the first class within a county that banned Sunday sales. It emphasized that all voters within the city could vote in the referendum, not just merchants or some other identified class. Therefore, the Appellate Division concluded that a statute that merely affects voting without actually denying the right to vote or depriving voters of equal representation may not be seen as interfering with the right to vote in the constitutional sense. It also held that the same principle applies to laws which are deemed "reform legislation" that merely extend the right to vote instead of restricting or denying it.

Thus, the court concluded:

The challenged law does not deprive *anyone* of the right to vote. Nor does it produce a disparity in the power to vote for representatives who can carry out the voters' will only indirectly. . . .

Although it is somewhat closer to cases like *Kramer*, in which the right to vote was limited to a group alleged to be particularly interested, this case is distinguishable because in those cases, the law operated to discriminate among eligible voters

within the district holding the election. Here, instead, the Legislature attempted to recognize the special needs and interests of politically distinguishable geographic areas—the state's largest cities—and, because of their perceived specialness, gave them a right to hold their own separate referenda.

The enactment may also be viewed as: "reform" legislation. Even where a fundamental right is implicated, reform legislation may be sustainable if it is merely rationally related to a legitimate governmental interest, even if it does not go as far as it might. . . .

[*Abramowitz*, 203 *N.J.Super.* at 126–27, 495 A.2d 1362.]

Similar results have been reached in other cases within our State. In *Robson v. Rodriquez*, 26 *N.J.* 517, 141 A.2d 1 (1958), the plaintiff challenged a provision of the Unsatisfied Claim and Judgment Fund Law which excluded a person who was injured or who sustained property damage in operating or riding in an uninsured vehicle owned by him or his spouse, parent or child, but did not exclude property damage recovery by an uninsured owner who was not present in his vehicle at the time of the accident. The plaintiff argued that the provision was unconstitutional since it did not exclude all uninsured owners from recovery. The Court held that if the exclusion of the class selected has some rational relationship to the fulfillment of an essential legislative design or some policy consideration bearing upon the common welfare, it was not pertinent that the legislative objective might be more fully achieved by another more expansive or inclusive classification. It concluded that the fact that the classification does not preclude all uninsured owners of motor vehicles from recovery does not impair its constitutional validity. In so doing, it identified several potential reasons why the Legislature did not exclude all uninsured motorists from coverage and found those possible justifications sufficient to sustain the distinction even though the Legislature did not express its rationale. *Robson*, 26 *N.J.* at 525–26, 141 A.2d 1.

In *Accident Index Bureau. Inc. v. Male*, 95 *N.J.Super.* 39, 229 A.2d 812 (App.Div.1967), *aff'd* 51 *N.J.* 107, 237 A.2d 880 (1968), the plaintiff challenged a statute precluding commercial agencies engaged in the business of selling or furnishing reports or abstracts of worker compensation records from obtaining access to those

records, even though employers and their employees were not barred from inspecting or copying those records for any purpose. The court acknowledged that the law discriminated between those who may and those who may not inspect and copy the records. However, it noted that not all classifications for purposes of legislation are invalid. Rather, it is the invidious discrimination lacking any valid basis which violates the constitutional mandate. The court found that the statute could eliminate a perceived evil, namely an activity which might unfairly disclose the names of prospective employees with prior worker's compensation histories. The consequences of such reporting could be the refusal to hire victims of industrial accidents, no matter how honest their claims may have been.

When the foregoing cases are applied to the matter before the court, it becomes evident that the Legislature has adopted a classification which passes muster. Certainly, many arguments can be raised about the equity involved in the delineation. For example, it was not necessary to deny the residents of LOSAP districts the right to vote in order to protect those already receiving pension payments or those who have sufficient time in service to qualify for a future pension. The grandfathering provisions of the statute protect all of those individuals. As to those not vested, it could be argued that the right to vote outweighs the goal of retention. Furthermore, it is possible that in districts where no LOSAP exists, the program could be proposed and rejected by the voters. In that event, defeated LOSAP proposals could act as a disincentive for those who had no expectation of the pension but who now are denied the prospect of having it, even though they perform the same services as those individuals in existing LOSAP jurisdictions. Additionally, there is no way of knowing with precision to what extent the prospect of a pension will, in fact, retain those who not yet vested. Yet, notwithstanding the potential injustice of the legislation, it cannot be said that the distinction which is drawn is so unreasonable as to be totally unrelated to any conceivable purpose.

The legislation does not contain an express statement of purpose. The legislative history is also very slim. The only indication of an objective is contained in a version of Senate Bill 1878 introduced on March 10, 1997. A statement attached to the Bill says that it was prompted by the November 1996, Attorney General opinion which advised the Department of Community Affairs that existing LOSAPs were not authorized by law. The statement notes that "the loss of the use of such incentives is expected to detract from the ability of communities to recruit and retain volunteer firefighters". S.1878, 207th Leg., 2d Ann.Sess., 1997 N.J. Laws 2.

Admittedly, in order to achieve the stated purpose, the Legislature has deprived the residents of LOSAP communities of the right to decide whether their program should continue. The result is a potentially heavy financial burden reflected in the municipal tax rate. However, as discussed earlier, it is the Legislature's right to make policy decisions regarding matters of health, safety and welfare, and the court is constrained to respect that judgment, at least when the enactment is found to be reasonably related to any conceivable legitimate public interest. Short of the legislation constituting invidious discrimination, the court may not interfere. It can be inferred that the Legislature considered recruitment, retention and the expectations of volunteers in existing LOSAP districts as important considerations in making the decision to adopt the classification in dispute. It made a judgment with which the court has no right to quarrel.

## II. SPECIAL LEGISLATION

Article IV, Section VII, Paragraph 9(8) provides in part:

9. The Legislature shall not pass any private, special or local laws:

(8) Granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever.

The plaintiffs contend that there is a three-part test to determine whether a statute is "special legislation". *Vreeland v. Byrne,* 72 *N.J.* 292, 300–01, 370 *A.*2d 825 (1977). First, the court

must discern the purpose and objective of the enactment. Second, it must undertake to apply it to the factual situation presented. Finally, it must decide whether, as applied, the resulting classification rests upon any basis rationally or reasonably relevant to the purpose and object of the act.

Plaintiffs argue first that the purpose of enacting Section 11 of the challenged statute was to overturn the Attorney General's opinion and this court's decision declaring that FD1's LOSAP was illegal. Second, when applied to the present factual situation, the effect is to permit the LOSAP to continue in FD1 and other similarly situated districts without the necessity of a public referendum to authorize it as is required in all other fire districts where LOSAPs do not exist. Third, plaintiffs assert that denying a referendum to the voters in those communities where LOSAPs do exist does not advance the purpose of the legislation nor is it rationally related thereto.

The defendants also rely on *Vreeland.* First, they claim that the purpose and object of the enactment is not limited by its express language and that the court must seek any conceivable reason for the classification created by the statute. The defendants suggest that the purpose of the exemption in Section 11 is to attract, retain and protect the good faith expectations of volunteers. Second, the defendants assert that the exclusion is tailored to apply only to those fire districts where LOSAPs exist and therefore is factually related to the situation presented to the Legislature. Finally, they conclude that the classification established by Section 11 is rationally related to the statute's purpose.

 The court concurs that the *Vreeland* test is applicable to this analysis and also agrees with the defendants' application of that test. It is certainly arguable that the legislation may attract and retain some volunteers as well as recognize the good faith expectations of those looking forward to receiving benefits under existing LOSAPs. Thus, in viewing the factual situation, it was not unreasonable for the Legislature to draw a distinction between those LOSAP districts where rights had vested or were accruing

and those where no LOSAPs existed. It can be inferred that by denying the right to public referendum in those districts with preexisting LOSAPs, the Legislature sought to protect the districts against the possible loss of present volunteers, shield the expectations of those anticipating LOSAP benefits and attract new volunteers. Therefore, the court is satisfied that the statutory distinction between the two types of fire districts and the differentiation between those who may and those who may not vote is reasonably relevant to the purposes and object of the Act and does not constitute special legislation.

## III. RETROACTIVITY—GRANDFATHERING

As noted earlier, Section 11 protects the rights of those who already have obtained a vested pension under existing LOSAPs and also exempts existing LOSAPs from the referendum provisions of the statute. The plaintiffs argue that the long-standing general rule of statutory construction favors prospective application of statutes. However, when the Legislature demonstrates an intent to apply a statute retroactively, as it has here, the court must inquire whether retroactive application will result in either an unconstitutional interference with vested rights or a manifest injustice to a party adversely affected by the retroactivity. *Phillips v. Curiale*, 128 *N.J.* 608, 617, 608 *A.*2d 895 (1992).

The plaintiffs insist that manifest injustice cannot be demonstrated in this case because the LOSAP participants are unable to show a good faith reliance upon the plan which this court has declared illegal. Further, plaintiffs maintain that the burden of the illegal appropriations made under the LOSAP should be borne by the persons who authorized the act and not the taxpayers.[2] Finally, plaintiffs assert that by grandfathering the LOSAPs from their inception, the effect of the statute is to establish and validate

---

[2] It is to be remembered that the existing LOSAPs were contractually created by the fire districts without voter approval or statutory authorization.

a property tax retroactive to the commencement of the program, thereby creating an illegal retroactive tax.

The defendants respond that legislation will be upheld if there is "a conceivable legitimate purpose" for grandfathering. *Paul Kimball Hosp. v. Brick Township Hosp.*, 86 *N.J.* 429, 441, 432 *A.*2d 36 (1981). They contend that retroactivity is warranted principally by the need to retain and reward the expectations of volunteers in existing LOSAP districts. Further, they argue that the effectuation of the legislation would not result in manifest injustice to the plaintiffs. They assert that the plaintiffs and the residents of LOSAP districts have benefited from the successful recruitment and retention of fire fighters. In addition, each budget which contained the LOSAP costs was subject to annual voter approval. Finally, under the present legislation, the residents have the ability to elect commissioners of their fire district who have the power to decide whether a resolution should be adopted authorizing a vote on the abolition of the existing LOSAP.

With regard to the claim of an illegal retroactive tax, the defendants assert that a two-prong analysis applies. *U.S. v. Carlton*, 512 *U.S.* 26, 114 *S.Ct.* 2018, 129 *L.Ed.*2d 22 (1994). The tax must have a rational legislative purpose which is not illegitimate or arbitrary and the retroactivity period must be modest. The defendants argue that the statute meets the *Carlton* test. First, the purpose behind the enactment was not illegitimate or arbitrary with respect to existing LOSAPs. It is claimed that the amendment is curative and does not establish a new policy in that it effectuates the legislative intent. Second, because the enactment was applied retroactively for only thirty-nine days from the date that this court's opinion declared the LOSAP illegal to the date that the LOSAP legislation was signed by the Governor, the period of retroactivity is modest.

In the court's view, there is no impediment to the retroactive protection of those already receiving benefits under existing LOSAPs. Additionally, there is no obvious manifest injustice to the residents of LOSAP districts who are unable to vote upon the

continuation of the LOSAPs. Certainly, it could be claimed that the failure to extend the right to vote to them is inequitable. However, that does not rise to the level of manifest injustice. As has been noted, each of the LOSAP districts has benefitted from the successful recruitment and retention of volunteers. Furthermore, each year the voters of those districts had the opportunity to vote on their proposed budget. Additionally, the voters in LOSAP districts have the power to eliminate the LOSAP either by persuading public officials to put the issue on the ballot or by electing Fire Commissioners dedicated to achieving that goal. Admittedly, from both the plaintiffs' and the court's perspectives, these options are improbable. However, this concern does not establish a manifest injustice as is contemplated by our cases.

Finally, the court cannot conclude that any retroactive tax is involved in this factual setting. The legislation does not impose a monetary burden retroactively on the taxpayers of LOSAP districts. For all of the years preceding the adoption of the statute, the LOSAP district voters were given the opportunity to approve the annual district tax budget. Thereafter, the tax was struck for each of the municipal budgets, including the fire district portion. Money was appropriated and utilized in each of those years for current fire district purposes, including LOSAPs. Therefore, the legislation does not require taxpayers to fund any LOSAPs retroactively.

## IV. CONCLUSION

In summary, the court acknowledges that the Legislature's classification, though far from indefectible, is constitutionally sustainable. While the delineation between the voting rights of residents of LOSAP districts and residents of districts without existing LOSAPs could be considered awkward or unjust, it is not so unreasonable as to be totally unrelated to any conceivable purpose. The goals of attracting, retaining and protecting the interests of volunteer fire fighters provide the unenunciated purposes underlying the denial of the right to vote on the continuation

of LOSAPs in districts where they exist. Similarly, because this discrimination is reasonably relevant to the purpose of the Act, it does not constitute special legislation. Finally, the retroactive application of the statute does not rise to the level of manifest injustice, nor does it create a retroactive tax.

Therefore, the court holds that the challenged portions of Chapter 388 of the Public Laws of 1997 are constitutional.